1   COTCHETT, PITRE & MCCARTHY LLP
    Frank M. Pitre (SBN 100077)
2   Mark C. Molumphy (SBN 168009)
    Tyson Redenbarger (SBN 294424)
3   Gia Jung (SBN 340160)
    San Francisco Airport Office Center
4   840 Malcolm Road Burlingame, CA 94010
    Telephone: (650) 697-6000
5   Fax: (650) 697-0577
    E-mail:      fpitre@cpmlegal.com
6                mmolumphy@cpmlegal.com
                 tredenbarger@cpmlegal.com
7                gjung@cpmlegal.com

8   BOTTINI & BOTTINI, INC.
    Francis A. Bottini, Jr. (SBN 175783)
9   Albert Y. Chang (SBN 296065)
    Anne B. Beste (SBN 326881)
10  7817 Ivanhoe Avenue, Suite 102
    La Jolla, California 92037
11  Telephone:   (858) 914-2001
    Facsimile:   (858) 914-2002
12  E-mail:      fbottini@bottinilaw.com
                 achang@bottinilaw.com
13               abeste@bottinilaw.com

14
15  *Attorneys for Plaintiff Amy Cook*

16              UNITED STATES DISTRICT COURT

17         FOR THE NORTHERN DISTRICT OF CALIFORNIA

18  AMY COOK, derivatively on behalf of      )   Case No. 3:23-cv-04935
    WELLS FARGO,                             )
19                                           )   **VERIFIED SHAREHOLDER**
                                 Plaintiff,) **DERIVATIVE COMPLAINT FOR:**
20              vs.                          )
                                             )
21  STEVEN D. BLACK, MARK A. CHANCY,         )   **(1)   BREACH OF FIDUCIARY**
    CELESTE A. CLARKE, THEODORE F.           )         **DUTY**
22  CRAVER, JR., RICHARD K. DAVIS,           )   **(2)   AIDING AND ABETTING**
    WAYNE M. HEWETT, CECELIA G.              )         **BREACH OF FIDUCIARY**
23  MORKEN, MARIA R. MORRIS, FELICIA         )         **DUTY**
    F. NORWOOD, RICHARD B. PAYNE, JR.,       )   **(3)   UNJUST ENRICHMENT**
24  JUAN A. PUJADAS, CHARLES H. NOSKI,       )   **(4)    DECLARATORY RELIEF**
    RONALD L. SARGENT, SUZANNE M.            )   **(5)   VIOLATION OF §14(a) OF**
25  VAUTRINOT, CHARLES W. SCHARF,            )         **THE SECURITIES**
    MICHAEL P. SANTOMASSIMO, SCOTT E.)            **EXCHANGE ACT OF 1934**
26  POWELL, KLEBER R. SANTOS, AND            )
    JONATHAN G. WEISS,                       )
27
28

---
**Verified Shareholder Derivative Complaint**



|  |  |
|---|---|
| Defendants,) | **(6)  VIOLATION OF §29(B) OF THE SECURITIES EXCHANGE ACT OF 1934** |
| - and - ) | |
| WELLS FARGO & COMPANY, a Delaware ) corporation, ) | **(7)  CONTRIBUTION AND INDEMNITY** |
| Nominal Defendant.) | **(8)  INSIDER TRADING** |
| ) | **(9)  ACCOUNTING** |
| ) | |
| ) | **DEMAND FOR JURY TRIAL** |
| ) | |

**PUBLIC VERSION OF DOCUMENT
PROPOSED TO BE FILED UNDER SEAL**

Verified Shareholder Derivative Complaint

# TABLE OF CONTENTS

Page

I.  NATURE OF THE ACTION ..................................................................................1

II.  JURISDICTION AND VENUE ............................................................................ 5

III.  THE PARTIES ....................................................................................................... 6

    A.  Plaintiff .......................................................................................................... 6

    B.  Nominal Defendant ...................................................................................... 6

    C.  The Individual Defendants ......................................................................... 6

        1.  The Director Defendants ................................................................. 6

        2.  The Officer Defendants .................................................................. 8

IV.  THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES .................................. 9

    A.  General Duties as Directors and Officers .................................................... 9

    B.  The Duty of Reasonable and Prudent Supervision ................................... 11

V.  BREACHES OF FIDUCIARY DUTIES .................................................................12

VI.  CONTROL, ACCESS, AND AUTHORITY..........................................................13

VII.  CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION ...........14

VIII.  FACTUAL ALLEGATIONS .................................................................................15

    A.  Discrimination and Retaliation Proliferated During the Relevant Time Period Under the Board's Watch........................................................15

    B.  The Board's Failure to Adopt and Implement Effective Internal Controls Caused the Company to be Subject to Multiple Consent Decrees ........................................................................................................ 18

    C.  The Company Hired Defendant Scharf to Address the Companies materially Defective Internal Controls and Past Discrimination.............. 22

    D.  The Company's Materially Defective Internal Controls Lead to the Imposition of an Asset Cap and Huge Fines ............................................. 27

    E.  The False and Misleading 2020 Proxy ....................................................... 29

    F.  In the Wake of the Murder of George Floyd, Wells Fargo's Board Represents That the Diverse Search Requirement Is a Key Initiative

to Fight Problems at the Company Even As the Board of Directors Continues to Receive Reports of Increased Harassment and Discrimination at the Company....................................................30

G.   The Director Defendants Caused Wells Fargo to Issue a False and Misleading Annual Report on February 23, 2021 and a Materially Misleading Proxy Statement on March 16, 2021........................................40

H.   The Individual Defendants are Awarded Improper Compensation Based on Alleged Success in Increasing Diversity......................................50

I.   The Truth Begins to Be Partially Revealed ................................. 54

J.   The Board had Direct Oversight of the Diverse Slate Program but Failed To Take Action After It Became Aware Of Fraud In The Program...........................................................................................65

K.   The Board of Directors Caused Wells Fargo to Repurchase Its Stock at Inflated Prices, Causing Over $7.14 Billion in Damages.......................70

L.   The Defendants Failed to Perform Any Investigation of Whether Executive Compensation should be Clawbacked in light of the DEI fraud ............................................................................................75

M.   Defendant Santos, Who Was in Charge of the Diverse Slate Program, Engaged in Insider Selling Shortly Before the Truth Was Announced ...................................................................................... 81

IX.    DAMAGES TO WELLS FARGO................................................................ 81

X.    DERIVATIVE ALLEGATIONS ................................................................. 82

A.   Demand Is Futile as to Scharf.................................................... 83

B.   Demand Is Futile as to Defendants Black, Hewett, Morris, and Sargent Who, as Members of the HRC, Had Direct Responsibility for Oversight of the Diverse Slate Program and the Executive Clawback Policy and Acted in Bad Faith ..................................... 84

C.   Demand is Futile as to All Directors Because They Approved the Issuance of the False and Misleading Statements.......................................86

XI.    CAUSES OF ACTION .......................................................................89

XII.   PRAYER FOR RELIEF.......................................................................99

XIII.  DEMAND FOR JURY TRIAL .......................................................... 100

Plaintiff Amy Cook, derivatively on behalf of Wells Fargo & Company ("Wells Fargo" or the "Company"), submits this Verified Shareholder Derivative Complaint against certain current and former members of Wells Fargo's Board of Directors (the "Board") and executive officers (collectively, the "Individual Defendants") for breaches of fiduciary duty, aiding and abetting breaches of fiduciary duty, unjust enrichment, declaratory relief, and other wrongdoing.  Plaintiff's investigation is based upon Plaintiff's stockholder inspection demand and review of non-public documents produced by Wells Fargo in response to such demand, a review of lawsuits filed against Wells Fargo by former employees, a review of Wells Fargo's SEC filings, analyst reports, transcripts of conference calls with analysts, and other information.  Plaintiff believes that the factual contentions in this complaint have evidentiary support and that additional evidentiary support for the allegations will exist after a reasonable opportunity for further investigation and discovery.  In support of these derivative claims, Plaintiff alleges as follows:

## I.        NATURE OF THE ACTION

1.        This is a shareholder derivative action to remedy the wrongdoing committed by Wells Fargo's directors and officers between approximately September 8, 2016 and the present (the "Relevant Period").

2.        Headquartered in San Francisco, California, Wells Fargo is a diversified, community-based financial services company with $1.9 trillion in assets.  Founded in 1852, Wells Fargo provides banking, insurance, investments, mortgage, and consumer and commercial financial services through more than 8,600 locations, 13,000 ATMs, mobile devices, and online (wellsfargo.com).  The Company has three reportable operating segments: Community Banking, Wholesale Banking, and Wealth and Investment Management.

3.        During the Relevant Period, the Individual Defendants breached their fiduciary duties as Wells Fargo's officers and directors in connection with the

1  Company's conduct in conducting fake interviews of racially and ethnically diverse

2  candidates for job positions that were already filled and with respect to public

3  statements concerning the Company's hiring and promotion practices and policies

4  related to increasing workforce diversity, including the Diverse Search Requirement.

5      4.    In March 2020, Wells Fargo implemented its Diverse Search

6  Requirement, which required that: (a) at least half of the candidates interviewed for

7  open jobs with a salary over $100,000 be diverse (a "diverse slate"); and (b) on

8  interviewer on the hiring panel represent at least one diversity dimension.

9      5.    The Diverse Search Requirement did not have its intended effect.  Instead,

10  managers hired white applicants and continued to take interviews of diverse candidates

11  after the position had been filled to meet the quota.  As former Wells Fargo employee

12  Joe Bruno explained in great detail, "HR recruiters[] tell the managers that you have to

13  conduct these interviews, even though you have clearly explained that a candidate has

14  already been sourced and selected."  The misconduct complained of herein was not that

15  of a rogue lower-level employee but instead a top-down mandate that came from the

16  Company's senior executives and Operating Committee members.  Indeed, in a

17  December 26, 2020 letter to the SEC, Wells Fargo admitted that "due to the importance

18  of the Diverse Search Requirement, the Company has established governance processes

19  relating to *senior-level approval* of any exception to the requirement for a specific role."

20  The Defendants were all aware that diverse candidates were being interviewed for

21  positions that had already been filled.  They received many requests for exceptions to

22  the policy by employees based on the fact that the position had already been filled, but

23  refused to grant exceptions so that Wells Fargo could create the false impression of

24  success on its DEI initiatives.

25      6.    During the Relevant Time Period, the Defendants were presented with

26  regular written information by management that constituted actual or constructive

27  knowledge that fake interviews of minority applicants were being conducted as part of

28

1   the Diverse Search Requirement, yet Defendants failed to take any action to correct the

2   fraud.  For example, at a June 28, 2022 ██████████████████ meeting,

3   which was attended by ████████████████████████, the Directors were

4   given a ██████████████████████████████

5   ████████████████████████████████████████

6   ██████████████████████████████

7   ████.[1]  ████ provided the Directors with written materials and graphs showing that

8   ██████████████████████████████████

9   ████████████████████████████████████

10  ████████████████████████████

11  ██████████████████████████████

12  ████████████████████  Instead, the

13  percentage of ██████████████████████████

14  ████████████████████████████████

15  ██████████████████████████████.[2]

16  The Directors knew or recklessly disregarded the written information provided to them.

17  They failed to take necessary action to address the fraud when presented with this

18  written information.

19      7.    The non-public Board of Directors materials produced to Plaintiff in

20  response to her stockholder inspection demand also demonstrate that there was strong

21  motive and opportunity for the Defendants to commit the fraud that plagued the Diverse

22  Slate program.  The Board's Human Resources Committee had direct oversight

23  responsibility over the program.  Defendant Scharf was personally in charge of the

24  Diverse Slate program and the Operating Committee.  In addition, exceptions to the

25  Diverse Slate interview mandate could only be approved by a member of Wells Fargo's

26  _____

27  [1] WF_DS_000002847.

28  [2] WF_DS_000002848.

1    Operating Committee. Those individuals' compensation was tied directly in substantial

2    part to their success or failure in DEI initiatives such as the Diverse Slate program.

3           8.    Some key Wells Fargo employees who were members of the ███████

4    ████████████████████████████████████████████████████████████████████

5    ██████████████████████████████████████████████████████████

6    ████████████████████████████████████████████████████████

7    ██████████████████████████████████████████████

8    ████████████████████████████████████████████████████████████████████

9    ████████████████████████████████████ █

10           9.    Defendant Jonathan Weiss, a Section 16 executive officer of the Company

11    and the Company's Senior Executive Vice President of Corporate and Investment

12    Banking, was also ██████████████████████████████████████

13    ████████████████████████████████████████████████████

14    ████████████████████████████████████████████

15    ████████████████████████████████████████████

16    ████████████████████████████████████."[4]  During 2021, Weiss

17    was ████████████████████████████████.[5]

18          10.    The Board of Directors' misconduct was the result of its repeated failure to

19    adopt and implement robust and effective internal controls over the key enterprise risks

20    facing the Company.  During the Relevant Time Period, Wells Fargo was operating

21    under multiple consent decrees from the government which required the Board to adopt

22    effective internal controls.  The Board failed to do so and the Individual Defendants'

23    

24        [3] The redacted material in this paragraph and elsewhere in the complaint has been made to comply with a confidentiality agreement Plaintiff was required to enter into with

25    Wells Fargo as part of her stockholder inspection demand, in response to which Wells Fargo produced substantial documents that it designated as confidential.

26        [4]    WF_DS_000000338;   WF_DS_000000342;   WF_DS_000000344;

27    WF_DS_000000346; WF_DS_000000352.

    [5] *See* 2022 Proxy at p. 88.

28    

**Verified Shareholder Derivative Complaint**     - 4 -

1  misconduct caused the Company to violate the consent decrees, causing substantial

2  harm to the Company.

3       11.     The Defendants breached their duty of loyalty to Wells Fargo and acted in

4  bad faith.  Both the Company and the minority candidates who were denied the actual

5  consideration of employment were harmed.  To date, the Company's Board of Directors

6  has taken no steps to hold its members or the Company's senior executives responsible

7  for the substantial harm caused.  Despite the fact that Wells Fargo has one of the

8  broadest executive clawback policies of any publicly-traded company, the Board's

9  Human Resources Committee, which is responsible for enforcement of the clawback

10  policy, has not taken any action against its executives' wrongdoing.

11      12.     Due to the Board's bad faith conduct and failure to take any action to

12  redress the harm, Plaintiff brings this stockholder derivative action to protect the

13  Company from the massive harm caused by the Individual Defendants.

14  **II.      JURISDICTION AND VENUE**

15      13.     The claims asserted herein arise in part under §14(a) of the Securities

16  Exchange Act of 1934, 15 U.S.C. §78n(a), and SEC regulation 14a-9 promulgated

17  thereunder, as well as Section 10(b) of the Securities Exchange Act of 1934.  Jurisdiction

18  is conferred by the Exchange Act, and supplemental jurisdiction over Plaintiffs' state law

19  claims is conferred by 28 U.S.C. §1367.

20      14.     Venue is proper pursuant to the Exchange Act.  Wells Fargo's

21  headquarters are located in San Francisco, California, and the false statements were

22  made in this District.

23      15.     The Court has jurisdiction over each named defendant because such

24  defendants are either entities which conduct business in and maintain offices in this

25  District or individuals who have sufficient minimum contacts with California so as to

26  render the exercise of jurisdiction by this Court permissible.

27

28

16.     A substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongs alleged herein, occurred in this District. Wells Fargo's headquarters are located in San Francisco, California, one or more of the individual defendants reside in San Francisco, and the acts giving rise to the violations complained of occurred in this District.

## III.    THE PARTIES

### A.    Plaintiff

17.     Plaintiff Amy Cook is a current shareholder of Wells Fargo.  Plaintiff has continuously held Wells Fargo stock since June 17, 2008, and continues to hold such stock.  Plaintiff will hold her shares of Wells Fargo stock through the conclusion of this lawsuit.

### B.    Nominal Defendant

18.     Nominal Defendant Wells Fargo & Company is a Delaware corporation with its principal place of business located at 420 Montgomery Street, San Francisco, California 94104.

### C.    The Individual Defendants

#### 1.    The Director Defendants

19.     Defendant Steven D. Black has been a director of Wells Fargo since 2020. Black is a member of Wells Fargo's Finance Committee and Human Resources Committee.

20.     Defendant Mark A. Chancy has been a director of Wells Fargo since 2020. Chancy is a member of Wells Fargo's Audit Committee and Finance Committee.

21.     Defendant Celeste A. Clarke has been a director of Wells Fargo since 2018. Clarke is a member of Wells Fargo's Corporate Responsibility Committee and Governance and Nominating Committee.

22.     Defendant Theodore F. Craver, Jr. has been a director of Wells Fargo since 2018.  Craver is a member of Wells Fargo's Corporate Responsibility Committee and

Governance and Nominating Committee.

23.    Defendant Richard K. Davis has been a director of Wells Fargo since 2022. Davis is a member of Wells Fargo's Risk Committee.

24.    Defendant Wayne M. Hewett has been a director of Wells Fargo since 2019.  Hewett is a member of Wells Fargo's Corporate Responsibility Committee, Governance and Nominating Committee, Human Resources Committee, and Risk Committee.

25.    Defendant Cecelia G. Morken has been a director of Wells Fargo since 2022.  Morken is a member of Wells Fargo's Audit Committee and Corporate Responsibility Committee.

26.    Defendant Maria R. Morris has been a director of Wells Fargo since 2018. Morris is a member of Wells Fargo's Human Resources Committee and Risk Committee.

27.    Defendant Felicia F. Norwood has been a director of Wells Fargo since 2022.  Norwood is a member of Wells Fargo's Risk Committee.

28.    Defendant Charles H. Noski served as a Director of Wells Fargo during the Relevant Time Period and member of the Company's Audit Committee and Governance and Nominating Committee.  Noski approved some of the false and misleading statements during the Relevant Time Period.

29.    Defendant Richard B. Payne, Jr. has been a director of Wells Fargo since 2019.  Payne is a member of Wells Fargo's Risk Committee.

30.    Defendant Juan A. Pujadas has been a director of Wells Fargo since 2017. Pujadas is a member of Wells Fargo's Finance Committee and Risk Committee.

31.    Defendant Ronald L. Sargent has been a director of Wells Fargo since 2018.  Sargent is a member of Wells Fargo's Human Resources Committee and Risk Committee.

32.    Defendant Suzanne M. Vautrinot has been a director of Wells Fargo since 2015.  Vautrinot is a member of Wells Fargo's Corporate Responsibility Committee and

1    Risk Committee.

2              **2.    The Officer Defendants**

3              33.    Defendant Charles W. Scharf has been the Chief Executive Officer

4    ("CEO"), President, and director at Wells Fargo since 2019.  Scharf received 2021 and

5    2022 compensation of $24.5 million and $24.5 million, respectively.

6              34.    Defendant Michael P. Santomassimo has been the Senior Executive Vice

7    President and Chief Financial Officer ("CFO") of Wells Fargo since 2020.  He is

8    responsible for the Company's financial management functions including accounting

9    and control, financial planning and analysis, line of business finance functions, asset-

10   liability management, treasury and tax.  He also serves on the Wells Fargo Operating

11   Committee.

12             35.    Defendant Scott E. Powell has been the Senior Executive Vice President

13   and Chief Operating Officer ("COO") of Wells Fargo since 2019.  He also serves on the

14   Wells Fargo Operating Committee.

15             36.    Defendant Kleber R. Santos served as the Head of Diverse Segments,

16   Representation, and Inclusion ("DSRI") and a member of the Company's Operating

17   Committee during the Relevant Time Period.  Santos reported directly to Defendant

18   Scharf and "was responsible for leading efforts to make the company a place where

19   diversity was reflected at all levels and in every facet of the company's operations,

20   processes, and programs."  Additionally, Santos' work as Head of DSRI was "focused on

21   creating a more diverse and inclusive working environment and partnering with Wells

22   Fargo's business leaders to deliver products and services designed to meet the needs of

23   diverse customer segments."  Each line of business at the Company had a Diverse

24   Segment Leader who reported to Santos.  Santos also served as interim Head of Human

25   Resources from April 23, 2021, to October 1, 2021, with responsibility for building and

26   implementing the strategies, programs, and infrastructure to develop, engage, and

27   retain talent for the Company.

28

37.     Defendant Jonathan G. Weiss was the Company's Senior Executive Vice President of Corporate and Investment Banking, and member of Wells Fargo's Operating Committee, during the Relevant Time Period.

38.     All Individual Defendants are collectively referred to as "Defendants."

## IV.     THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

### A.     General Duties as Directors and Officers

39.     By reason of their positions as Wells Fargo's officers and directors and because of their ability to control Wells Fargo's business and corporate affairs, the Individual Defendants owed Wells Fargo and its shareholders fiduciary obligations of trust, loyalty, good faith, candor, and due care, and were required to use their utmost ability to control and manage Wells Fargo in a fair, just, honest, and equitable manner. The Individual Defendants were required to act in furtherance of the best interests of Wells Fargo and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

40.     Each director and officer owes to Wells Fargo and its shareholders the fiduciary duty to exercise good faith and diligence, as well as the highest obligations of loyalty and fair dealing, in the administration of Wells Fargo's affairs and in the use and preservation of its property and assets.

41.     The Individual Defendants, because of their positions of control and authority as Wells Fargo's directors and officers, were able to and did directly and/or indirectly, exercise control over the misconduct complained of herein.

42.     To discharge their duties as Wells Fargo's officers and directors, the Individual Defendants were required to exercise reasonable and prudent supervision over Wells Fargo's management, policies, practices, and controls of the affairs of the Company.  Accordingly, the Individual Defendants were required to:

- o ensure that Wells Fargo was operated in a diligent, honest, and prudent manner in accordance with its bylaws and charter, as well as the laws and regulations of California and the United States;
- o conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;
- o remain informed as to how Wells Fargo conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;
- o establish and maintain systematic and accurate records and reports of the business and internal affairs of Wells Fargo and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;
- o maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Wells Fargo's operations would comply with all laws and its financial statements filed with the SEC and disseminated to the public and Wells Fargo's shareholders would be accurate;
- o exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate; and
- o examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, among other things, each of the subjects and duties set forth above.

Verified Shareholder Derivative Complaint      - 10 -

43. As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Securities Exchange Act of 1934 (the "Exchange Act") and traded on the NYSE, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, management, earnings, and present and future business prospects; and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Relevant Period violated these specific requirements and obligations. Thus, the Individual Defendants breached their fiduciary duties by causing or recklessly permitting violations of the federal securities laws.

**B.    The Duty of Reasonable and Prudent Supervision**

44. The Individual Defendants are required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the Individual Defendants are required to, among other things:

- o (a) ensure that Wells Fargo maintains adequate internal controls over hiring practices and federal and state regulations governing its banking operations;
- o (b) ensure that Wells Fargo complies with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;
- o (c) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

1       ○  (d) properly and accurately guide investors and analysts as to the true

2           financial condition of the Company at any given time, including making

3           accurate statements about the Company's hiring practices, DEI initiatives,

4           and financial results and compliance with the law;

5       ○  (e) remain informed as to how Wells Fargo conducted its operations, and,

6           upon receipt of notice or information of imprudent or unsound conditions or

7           practices, make reasonable inquiry in connection therewith, and take steps to

8           correct such conditions or practices and make such disclosures as necessary to

9           comply with securities laws; and

10      ○  (f) ensure that Wells Fargo was operated in a diligent, honest, and prudent

11          manner in compliance with all applicable laws, rules, and regulations.

## V.    BREACHES OF FIDUCIARY DUTIES

13      45.    Each Individual Defendant owed to Wells Fargo and to its shareholders

the fiduciary duty of loyalty and good faith, and the exercise of due care and diligence in

managing and overseeing Wells Fargo's affairs, as well as in the use and preservation of

its property and assets.  The Individual Defendants' misconduct involves a knowing and

culpable violation of their obligations as directors and officers of Wells Fargo, the

absence of good faith on their part, or a reckless disregard of their duties that they were

aware or should have been aware posed a risk of serious injury to Wells Fargo.  Each

Individual Defendant ratified each other's misconduct because they collectively

comprised Wells Fargo's Board and management at all relevant times.

22      46.    The Individual Defendants each breached their duties of loyalty and good

faith by allowing Defendants to cause, or by themselves causing, the Company to make

false and/or misleading statements and/or failing to disclose:

25      ○  (a) the Company was conducting fake interviews of minority candidates for

26          job positions that had already been filled;

27

28

- o  (b) Wells Fargo was misrepresented facts about its Diverse Slate Program and Diverse Search Requirement;
- o  (c) the Company's financial statements were false and misleading because they did not disclose the true facts regarding the Diverse Slate Program and the lack of effective internal controls at the Company;
- o  (d) the Company lacked adequate internal and financial controls; and
- o  (e) as a result of the foregoing, the Company's financial statements and SEC filings were materially false or misleading at all relevant times.

47.    In addition, as a result of the Individual Defendants' actions and course of conduct, the Company is now the subject of lawsuits and governmental investigations that allege violations of numerous federal and state laws.  As a result, Wells Fargo has expended, and will continue to expend, significant sums of money to rectify the Individual Defendants' wrongdoing.

## VI.    CONTROL, ACCESS, AND AUTHORITY

48.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Wells Fargo.

49.    Because of their advisory, executive, managerial, and directorial positions with Wells Fargo, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Wells Fargo.

50.    Each of the Individual Defendants was the agent of each of the other Defendants and of Wells Fargo, and was at all times acting within the course and scope of such agency.

**VII.    CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

51.    In committing the wrongful acts alleged herein, Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

52.    During all times relevant hereto, Defendants collectively and individually initiated a course of conduct that was designed to and did conceal the fact that:  (a) Wells Fargo was conducting fake interviews of minority candidates for job positions that had already been filled; (b) Wells Fargo was misrepresented facts about its Diverse Slate Program and Diverse Search Requirement; (c) Wells Fargo lacked adequate internal controls; and (e) as a result of the foregoing, Wells Fargo's representations to the market and stockholders were false and misleading.

53.    Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, Defendants caused Wells Fargo to issue false or misleading statements about its DEI initiatives, Diverse Search Requirement, and the adequacy of the Company's internal controls and compliance with past consent decrees.

54.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the Individual Defendants' violations of law, including breaches of fiduciary duties; and (b) disguise and misrepresent the Company's DEI initiatives, Diverse Search Requirement, and internal controls and compliance with consent decrees.

55.    Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing Wells Fargo to falsely represent facts about the Diverse Search Requirement, falsely state that Wells Fargo had adequate internal controls in place, and by purposefully, recklessly, or negligently causing Wells Fargo to release false and misleading statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct,

1   necessary, and substantial participant in the conspiracy, common enterprise, and/or

2   common course of conduct complained of herein.

3       56.    Each Defendant aided and abetted and rendered substantial assistance in

4   the wrongs complained of herein.  In taking such actions to substantially assist the

5   commissions of the wrongdoing complained of herein, each Defendant acted with

6   knowledge of the primary wrongdoing, substantially assisted the accomplishment of

7   that wrongdoing, and was aware of his (or her or its) overall contribution to and

8   furtherance of the wrongdoing.

9   **VIII.  FACTUAL ALLEGATIONS**

10      **A.    Discrimination and Retaliation Proliferated During the
            Relevant Time Period Under the Board's Watch**

11

12      57.    For over a decade, Wells Fargo has lacked a diverse workforce, especially

13  in its wealth management division, which has historically been predominantly

14  composed of white males.  Even when Wells Fargo hired minorities, it was accused of

15  paying them less, promoting them to fewer managerial positions, and otherwise treating

16  minorities disparately.

17      58.    In 2012, Wells Fargo settled the second largest fair lending claim in the

18  DOJ's history to "resolve allegations that [it] . . . engaged in a pattern or practice of

19  discrimination against qualified African-American and Hispanic borrowers in its

20  mortgage lending [practices] from 2004 through 2009."  Under the terms of the

21  settlement, Wells Fargo agreed to pay over $184 million to affected borrowers that the

22  Company "steered into subprime mortgages or who paid higher fees and rates than

23  white borrowers because of their race or national origin."

24      59.    In 2013, a class of Wells Fargo's African-American financial advisors sued

25  the Company in an action entitled *Slaughter v. Wells Fargo Advisors, LLC*, Case No. 13-

26  cv-6368 (N.D. Ill.) (the "*Slaughter* Action"), alleging that they were denied the same

27  opportunities as their white counterparts.  The complaint alleged that Wells Fargo

28

effectively "segregate[d] [its] workforce by race" by intentionally placing African-American financial advisors in neighborhoods that generated less revenue, precluding them from access to lucrative clients, separating them internally from white financial advisors, and "limiting their . . . advancement opportunities." The plaintiffs also alleged that African Americans were under-represented both as financial advisors and in management and executive positions at Wells Fargo, and paid substantially less than employees who were not African American.

60.    In December 2016, Wells Fargo settled the *Slaughter* Action for $36 million and agreed to take a number of preventative measures to improve its treatment of African-American financial advisors going forward, including "encourag[ing] a diverse pool of applicants . . . and a diverse slate of evaluators" for job openings. As a result of the *Slaughter* Action, Wells Fargo established an informal, unwritten policy requiring that at least one woman or person of color be interviewed for certain open senior positions. The terms of the settlement also required that Wells Fargo (i) designate a person whose primary responsibility was the recruitment of African American financial advisors and financial advisor trainees; (ii) establish two coach positions whose primary responsibility was to work with African American financial advisors and financial advisor trainees; (iii) create leadership teams including African Americans; and (iv) require that internal reports reflect financial advisor representation, recruiting and hiring of experienced financial advisors, as well as include racial data for the financial advisors.

61.    During the Relevant Time Period, Wells Fargo's Board also allowed the Company to retaliate against whistleblowers, thus creating a company culture that discouraged employees from reporting wrongdoing. For example, in 2016, former Wells Fargo employees came forward and disclosed the Company's retaliatory conduct,

describing how Wells Fargo mistreated and retaliated against whistleblowers.[6]  One former Wells Fargo human resources official said the bank had a method in place to retaliate against tipsters. He said that Wells Fargo would find ways to fire employees "in retaliation for shining light" on unlawful conduct. The HR employee said that the company engaged in tactics such as monitoring the employee to find a fault, like showing up a few minutes late on several occasions, which it then used as a pretext to fire the employee who had reported the wrongdoing.[7]

62.   In 2017, several former Wells Fargo employees filed lawsuits alleging retaliation by the Company for raising concerns about unlawful conduct, unscrupulous automobile lending practices and improper mortgage rate fees.  One suit was filed in July 2017 by former Wells Fargo mortgage consultant Mauricio Alaniz.[8] Taken together, the allegations speak to a common thread at Wells Fargo where scandals are often accompanied by worker retaliation claims.[9]

63.   Also in 2017, the U.S. Department of Labor's Occupational Health and Safety Administration (OSHA) ordered Wells Fargo to reinstate and pay damages to a former bank manager who was retaliated against and terminated in 2010 after reporting suspected fraudulent behavior to his superiors as well as through a bank ethics hotline. The OSHA ordered Wells Fargo to reinstate the whistleblower, correct his personnel file, and fully compensate him for lost earnings.  Total awarded damages were $5.4 million, representing OSHA's largest whistleblower award at the time.[10]  In the case of other former Wells Fargo employees who were fired in recent years, NPR found that the bank

---

[6] *See* Matt Egan, "I Called the Wells Fargo Ethics Line and Was Fired," CNN Business, Sept. 21, 2016.

[7] *Id.*

[8] *See* Matt Egan, "More Wells Fargo Workers Allege Retaliation for Whistleblowing," CNN Business, Nov. 7, 2017.

[9] *Id.*

[10] *See* Bill Chappel, "Wells Fargo Will Fight OSHA Order To Pay Whistleblower $5.4 Million And Rehire Him," NPR, Apr. 4, 2017.

had also placed negative information on their U5 forms—which are reported to a national database for bank workers—thus making it difficult for the employees to find new jobs.[11]

64.    At the time, Defendant Sloan stated that even one instance of retaliation was "totally unacceptable," and yet the retaliation continued.  On September 1, 2022, the OSHA ordered Wells Fargo to pay more than $22 million for retaliating against an employee who reported suspected financial misconduct, including wire fraud, price fixing and being instructed to falsify customer information.[12]

**B.    The Boards Failure to Adopt and Implement Effective Internal Controls Caused the Company to be Subject to Multiple Consent Decrees**

65.    Meanwhile, Wells Fargo had been rampantly opening "fake accounts" without customer authorization.  The Company ultimately determined that it had opened at least 3.5 million unauthorized accounts resulting in approximately $6.1 million in unauthorized banking fees being charged to its customers.  As a result of this misconduct, the CFPB required Wells Fargo to enter into a consent decree on September 8, 2016 which imposed a fine of $100 million, the largest it had ever imposed, and required Wells Fargo to reimburse customers for fees it had charged them related to the fake accounts.

66.    As part of the 2016 Consent Decree, the CFPB also ordered Wells Fargo to hire and pay a third-party consultant to review the Bank's sales practices and utilize the consultant's report to develop a compliance plan to rectify deficiencies and implement recommendations.  Wells Fargo was required to submit the compliance plan to the CFPB for review.  The 2016 CFPB Consent Decree also required the Company's Board of Directors to "review all submissions . . . required by this Consent Order before

---

[11] *Id.*

[12] *See* Wyatte Grantham-Phillips, "Wells Fargo Ordered to Pay $22 Million for Firing Executive Who Alleged Financial Misconduct," USA Today, Sept. 2, 2022.

submission to the [CFPB]" and stated "the Board will have the ultimate responsibility for proper and sound management of [the Bank] and for ensuring that [the Bank] complies with Federal consumer financial law and this Consent Order."[13]

67.    The same month, the OCC also issued an order imposing additional oversight obligations on Wells Fargo's Board.  On September 6, 2016, the OCC issued an Order which imposed a fine of $35 million on Wells Fargo and required the Company to develop and submit a "Comprehensive Action Plan" for complying with the order's various requirements.  In addition, Wells Fargo was required to pay $50 million to the City and County of Los Angeles, for total fines from the CFPB, the OCC, and Los Angeles of $185 million.

68.    The 2016 OCC Order required Wells Fargo to, among other things, "develop an enterprise-wide sales practices risk management and oversight program" (Article V); implement "enterprise-wide policies and procedures for tracking, managing, and reporting customer complaints" (Article VI); review and revise the Bank's internal audit program (Article VII); and develop a "reimbursement plan" to remediate the harms arising from the illegal sales practices (Article VII).On February 2, 2018, the Federal Reserve Board issued an order which noted that Wells Fargo's "business strategy that emphasized sales and growth without ensuring that senior management had established and maintained an adequate risk management framework commensurate with the size and complexity of [Wells Fargo], which resulted in weak compliance practices."[14]  The order required Wells Fargo "to adopt an improved firmwide risk management program designed to identify and manage risks across the consolidated organization," consistent with Section 252.33(a)(2) of Regulation YY.[15]

---

[13] *See* 2016 CFPB Order at 13-14.

[14] Order at p. 2.

[15] *Id*. at p. 1.

69.     The order required the Board to submit a written plan, within 60 days of the order, "to further enhance the Board's effectiveness in carrying out its oversight and governance" (the "Board Effectiveness Plan").  Among other things, the plan was required to address the "actions that the Board will take to further improve its effectiveness . . . further improve its oversight of senior management . . . [and] ensure senior management's ongoing effectiveness in managing [Wells Fargo]'s activities and related risks and promoting strong risk management."[16]  After adopting and implementing the Board Effectiveness Plan and Risk Management Plan, Wells Fargo was also required to "conduct and complete by an appropriate date no later than September 30, 2018, an independent review of" the Board Effectiveness Plan and the Risk Management Plan.

70.     On April 20, 2018, the OCC announced that it had "assessed a $500 million civil money penalty against Wells Fargo Bank, N.A., and ordered the bank to make restitution to customers harmed by its unsafe or unsound practices, and develop and implement an effective enterprise-wide compliance risk management program."[17] The OCC's press release also stated:  "The $500 million civil money penalty reflects a number of factors, including ***the bank's failure to develop and implement an effective enterprise risk management program to detect and prevent the unsafe or unsound practices, and the scope and duration of the practices***." The Consent Order was approved by the Board itself and can be found here: https://www.occ.gov/static/enforcement-actions/ea2018-025.pdf

71.     One key finding of the Consent Order was that "[s]ince at least 2011, the Bank has failed to implement and maintain a compliance risk management program commensurate with the Bank's size, complexity and risk profile," which resulted in

---

[16] Order at pp. 4-5.

[17] *See* "OCC Assesses $500 Million Penalty Against Wells Fargo, Orders Restitution for Unsafe or Unsound Practices," Apr. 20, 2018, available at https://www.occ.gov/news-issuances/news-releases/2018/nr-occ-2018-41.html, last visited Sept. 14, 2023.

"reckless unsafe or unsound practices and violations of law."[18]  Other substantial

findings in the Consent Order were that Wells Fargo failed "to execute on a

comprehensive plan to address compliance risk management deficiencies," failed "to fill

mission-critical staffing positions for Wells Fargo," failed to adequately report "to the

Board regarding compliance concerns, the regulatory landscape, and the Bank's efforts

to correct its compliance problems and address regulatory changes," and failed to

"adequately develop and implement key elements of its compliance risk management

program."[19]

72.    The April 20, 2018 OCC Consent Decree required the Board to directly

oversee and ensure compliance with the order.  The OCC Consent Decree stated that

"The Board shall appoint and maintain an active Compliance Committee of at least three

(3) members," which would be "responsible for monitoring and overseeing the Bank's

compliance with the provisions of this Order."[20]  The Compliance Committee was

required to "meet quarterly and maintain minutes of its meetings" and to submit

"written progress report[s] to the Board" every 45 days (starting 120 days after the 2018

OCC Order).  The Consent Decree also required Wells Fargo to develop and submit to

the OCC, within 60 days, a Compliance Risk Management Plan "containing a complete

description of the actions necessary and appropriate to achieve compliance" with the

2018 OCC Order.91  The order required Wells Fargo to establish an "Enterprise-Wide

Compliance Risk Management Program" that included, among other things: "[a]n

effective compliance risk framework that establishes the responsibility and

accountability for respective front line units and independent compliance risk

management;" "[a] program to develop, attract, and retain talent and maintain

appropriate staffing levels to fulfill respective roles in the Bank's compliance risk

---

[18] *See* Consent Order at p. 2.

[19] *Id.* at pp. 2-3.

[20] *Id.* at p. 5.

1    management framework;" and "[a] program that establishes enterprise-wide policies

2    and processes to ensure effective compliance governance and oversight for new products

3    and services."[21]

4         73.    In 2019, the United States Department of Labor made findings, based on

5    its investigation, that in 2014 Wells Fargo had discriminated against 2,066 female job

6    applicants and 282 African-American job applicants.  As a result, Wells Fargo was

7    forced to enter into a Conciliation Agreement with the DOL and pay affected applicants

8    back wages and to "review and revise its selection process and provide better training to

9    its hiring managers to eliminate [the] practices that resulted in the violations."

10        **C.    The Company Hires Defendant Scharf to Address the Companies Materially Defective Internal Controls and Past Discrimination**

11

12        74.    In September 2019, Wells Fargo announced that it had hired Defendant

13   Scharf as its new CEO, effective October 21, 2019.  Scharf declared that his first and

14   paramount priority would be to fix Wells Fargo's rampant and recurring regulatory

15   violations and lack of effective internal controls.[22]  The Company's 2020 Proxy

16   described Scharf as having a "passion for diversity and inclusion" and a "commitment to

17   strong talent management."  In a January 2020 press release filed with the SEC on

18   Form 8-K, Scharf stated, "[d]uring my first three months at Wells Fargo my primary

19   focus has been on advancing our required regulatory work with a different sense of

20   urgency and resolve."  He added that Wells Fargo "has made some serious mistakes, and

21   my mandate is to make the fundamental changes necessary to regain the full trust and

22   respect of all stakeholders."

23

24   _____

25        [21] *Id.* at pp. 7-8.

26        [22] *See* Matt Egan, "Wells Fargo Has a New Boss; His First Task is Taming Washington," Oct. 3, 2019, CNN (quoting Scharf as stating "we have a series of regulatory issues that we need to complete the work on. And so that is clearly the first priority."),
27   available        at        https://www.cnn.com/2019/10/03/business/wells-fargo-ceo-scharf/index.html, last visited Apr. 26, 2023.

28

75.    Scharf was awarded $23 million in compensation in 2019 for his short three months of work, as disclosed in the following chart from the 2020 Proxy:

| Named Executive and Position | Base Salary ($) | 2019 Pay-for-Performance Outcome | | | |
| --- | --- | --- | --- | --- | --- |
| | | Annual Incentive ($) | Performance Shares ($) | RSRs ($) | Total Compensation ($) |
| **Charles W. Scharf** Chief Executive Officer and President | 2,500,000 | 5,000,000 | 15,500,000 | — | 23,000,000 |

76.    Scharf and the Board were well aware of Wells Fargo's substantial problems regarding DEI as of 2019.  The Company lacked significant representation of minorities and other historically underrepresented persons in its workforce, especially upper management.  In addition, Scharf and the Board were aware of at least two increasingly problematic trends.  First, reports of harassment and discrimination were increasing at Wells Fargo.  Second, as a result of the first trend, minorities and other historically underrepresented individuals were voluntarily quitting their jobs at Wells Fargo at rates higher than non-minority employees.  All the Director Defendants also had actual knowledge that the Company was operating under the yoke of multiple consent decrees and that the Board had direct responsibility for complying with such consent decrees.  They also knew that they had failed to comply with such decrees because the Company's internal controls were still highly defective, including the required Board Effectiveness Plan and Risk Management Plan.

77.    In 2019, as is true today, Wells Fargo's Human Resources Committee ("HRC") was responsible for DEI issues.  In 2019, half of the members of this committee were white males.

78.    On December 9, 2019, the members of Wells Fargo's HRC—Director Defendants Hewett, Sargent, James and Morris—received a report entitled ████████ ████████████████████████ ■ The report was presented by David Galloreese, Chief Human Resources Officer, who reported directly to Defendant Scharf.

---

[23] WF_DS_000000024.

79.     In the report, Defendants Hewett, Sargent, James and Morris were advised that ████████████████████████████████████████████

████████████████████████████████████████████████.[24]

80.     Defendants Hewett, Sargent, James and Morris were specifically told that:

> "These actions by team members expose Wells Fargo to *significant human capital, legal, and reputational risk* and potentially reflect *unsafe and unsound management practices. . . **The number of substantiated allegations related to these behaviors could indicate ineffective human capital management in areas including poor hiring/selection decisions,*** ineffective people management, lack of training and awareness of relevant policies and procedures, ***as well as ineffective team member diversity management,*** non-adherence to performance management requirements and other cultural and environmental factors that may need to be addressed."[25]

81.     The December 9, 2019 ████████████████████████████████ also informed Wells Fargo's Board members that ████████████████████

████████████████████████████████████████████████████████

████████████████████ The report stated:

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████[26]

82.     According to research by Stanford Graduate School's Corporate Governance Research Initiative, there was **no** racial or ethnic diversity among Wells Fargo's CEO and his *12 direct reports* as of December 11, 2019.

83.     In 2020, Wells Fargo entered into a $7.8 million Conciliation Agreement with the DOL stemming from an investigation into the Company's alleged discrimination against 34,193 African-American job applicants and 308 female job applicants across the country.  In addition, Wells Fargo agreed to "proactively" "enhance

---

[24] WF_DS_000000093.

[25] WF_DS_000000094.

[26] WF_DS_000000098.

1  future compliance" with federal anti-discrimination laws by "tak[ing] steps to ensure its

2  personnel practices comply with federal requirements."

3      84.    In January 2020, Scharf admitted that, "[a]t the time of the sales practices

4  issues, the company did not have in place the appropriate people, structure, processes,

5  controls, or culture to prevent the inappropriate conduct."

6      85.    In March 2020, the U.S. House of Representatives' Committee on

7  Financial Services issued a report entitled "The Real Wells Fargo: Board & Management

8  Failures, Consumer Abuses, And Ineffective Regulatory Oversight."  The report is

9  available at https://www.congress.gov/116/meeting/house/110719/documents/HHRG-

10 116-BA00-20200311-SD003.pdf.  The Report noted that "Wells Fargo's board failed to

11 hold senior management accountable for the Bank's lack of progress under the consent

12 orders, despite the performance concerns raised by regulators and certain board

13 members."  Report at 8-9.

14     86.    Major findings of the report included the fact that: (i) "Wells Fargo's board

15 of directors failed to ensure management could competently address the Company's risk

16 management deficiencies"; (ii) "Wells Fargo's board of directors allowed management to

17 repeatedly submit materially deficient plans to regulators in response to the consent

18 orders"; (iii) "both Wells Fargo's board and management prioritized financial and other

19 considerations above fixing the issues identified by regulators"; (iv) Wells Fargo's board

20 did not hold senior management accountable for repeatedly failing to meet regulators'

21 expectations"; (v) "former Wells Fargo CEO Timothy J. Sloan gave inaccurate and

22 misleading testimony to Congress during a March 2019 Committee hearing"; and (vi)

23 "the potential for widespread consumer abuse still remains at Wells Fargo."  *See* Report

24 at 4-5.  The Report also determined that Wells Fargo's Board caused the Company to

25 staff "unqualified individuals in key compliance positions and that "[i]nstead of building

26 its compliance risk management system with inhouse employees, the Bank outsourced

27 compliance to outside consultants."  Report at p. 31.

28

87.     The March 2020 Congressional report also faulted the Board of Directors for allowing management to "repeatedly submit materially deficient plans in response to the Consent Orders."  Report at p. 36.  It noted that Wells Fargo submitted multiple deficient plans that required board review (and with regards to plans required by the OCC, board approval) in response to the 2016 Sales Practices Consent Orders.  The Committee staff's investigation revealed that the CFPB and OCC repeatedly rejected the Bank's compliance and redress plans required under the 2016 Sales Practices Consent Orders as incomplete or otherwise deficient.  The Report noted that Wells Fargo's Board was directly involved in the process and was specifically told what needed to be done to comply with the consent orders.[27]

88.     The Federal Reserve's staff even held one-on-one sessions with several of Wells Fargo's directors.[28]  Still, the Board of Directors failed to ensure compliance with the consent decrees.  For example, on April 3, 2018, Wells Fargo made its first submission of plans for board effectiveness and risk management under the 2018 Federal Reserve Consent Order.  "Despite receiving consistent direction from Federal Reserve staff on what sufficiently detailed plans should include, Wells Fargo's first submission of plans for board effectiveness and risk management, made on April 3, 2018, fell woefully short of the Federal Reserve's expectations."[29]  In a May 7, 2018 response letter, Federal Reserve staff informed Wells Fargo that its submission was so "materially incomplete" that the plans, "cannot be evaluated by [Federal Reserve] staff

---

[27] The discussions between Federal Reserve and Wells Fargo personnel during these meetings are memorialized in meeting minutes and notes produced by the Federal Reserve, Wells Fargo, and certain Wells Fargo board members. The meeting records show that Federal Reserve staff consistently emphasized to the Company's directors and management that Wells Fargo's plans under the consent order needed to, among other requirements: identify the root causes of the problems addressed; explain how each required program would operate once Wells Fargo remediated the problems; outline the steps necessary to get from the current state to an operational and effective program; and, clearly define responsibilities and lines of accountability>' Report at

[28] *See* Report at p. 37.

[29] *See* Report at p. 38.

for their adequacy."[30]  The Federal Reserve noted that "[b]uilding an effective operational risk management program is a key focus of the Order," yet "…[t]he plans fail to comprehensively address operational risk…."[31]

89.     As a result, The Federal Reserve rejected Wells Fargo's April 3, 2018 submission and gave the firm 90 days to submit revised plans that addressed the requirements of the consent order.  On October 31, 2018, after the Federal Reserve approved two extension requests from the firm, Wells Fargo submitted revised plans addressing board effectiveness and risk management.  Wells Fargo's October 31, 2018 submission failed to meet the Federal Reserve's expectations and was rejected.  On March 11, 2019, the day before Sloan testified before the House Financial Services Committee, the Federal Reserve sent a letter to WFC Chair Duke and CEO Sloan in response to Wells Fargo's October 31, 2018 plans.  The Federal Reserve found that, "the firm's plans to remediate the Order remain materially incomplete," with respect to operational risk management and other requirements of the consent order (emphasis added).[32]

### D.     The Company's Materially Defective Internal Controls Lead to the Imposition of an Asset Cap and Huge Fines

90.     Wells Fargo's ongoing governmental investigations and regulatory violations led to the imposition of an asset cap by the Federal Reserve in 2018.  That asset cap prevented Wells Fargo from increasing the size of assets on its balance sheet above $2 trillion.

---

[30] *Id.*

[31] Letter from Federal Reserve to Elizabeth Duke, Chair of the Board of Directors, WFC, and Tim Sloan, Chief Executive Officer, WFC, FRB_HFSC-00003438-43 (May 7, 2018) (on file with the House Financial Services Committee).

[32] *See* Letter from Federal Reserve to Elizabeth Duke, Chair of the Board of Directors, WFC, and Tim Sloan, Chief Executive Officer, WFC, FRB_HFSC-00018565-75 (Mar. 11, 2019) (on file with the House Financial Services Committee).

91.     The asset cap was the top concern among the Company's stockholders because its existence prevented Wells Fargo from making the loans necessary to increase revenues and profits.  Under the yoke of the Asset Cap, Wells Fargo was precluded from increasing its balance sheet until it remedied its materially defective internal controls and risk management practices.  The Federal Reserve stated it would not lift the Asset Cap until Wells Fargo: (i) "submit[ted] a written plan" to "improve its firmwide compliance and operational risk management" and "enhance" its Board's "effectiveness in carrying out its oversight and governance" responsibilities; (ii) secured approval of such a plan by the Federal Reserve Board; (iii) implemented the plan; (iv) had a "third party . . . review its implementation"; and (v) got the Federal Reserve Board's "vote to lift the asset cap."

92.     The Asset Cap has harmed Wells Fargo tremendously.  In 2020, Bloomberg estimated that the cap had already cost the bank at least $4 billion in profits.

93.     Wells Fargo has also suffered immeasurable reputational damage due to the repeated harassment and discrimination misconduct.  In an August 1, 2017 article entitled "Give Wells Fargo the Corporate Death Penalty," The New Republic wrote that ***"[t]he bank is a serial corporate criminal that has screwed over millions of Americans***."[33]  The Los Angeles Times reported in January 2020 that Wells Fargo had suffered "catastrophic reputational damage."

94.     By the end of 2021, Wells Fargo was subject to 12 separate consent orders with federal agencies, including three from the Federal Reserve, three from the Consumer Financial Protection Bureau (the "CFPB"), and six from the Office of the Comptroller of Currency (the "OCC").

95.     On December 20, 2022, Wells Fargo paid $3.7 billion to settle charges by the CFPB that it harmed customers on their auto loans, home mortgages, and bank

---

[33] *See* David Dayen, "Give Wells Fargo the Corporate Death Penalty," The New Republic, Aug. 1, 2017, available at https://newrepublic.com/article/144144/give-wells-fargo-corporate-death-penalty, last visited May 4, 2023.

1  accounts, including wrongfully repossessing people's automobiles and taking actions

2  that caused borrowers to lose their homes.  Wells Fargo had also charged improper

3  overdraft fees on checking accounts according to an order issued by the CFPB.

4        96.    In May 2023, Wells Fargo agreed to pay $1 billion for resolve securities

5  fraud claims arising from false statements about the pace of Wells Fargo's remediation

6  efforts. *In re Wells Fargo & Company Sec. Litig*., No. 1:20-cv- 04494-GHW-SN

7  (S.D.N.Y.) ("Securities Action").

8        97.    The legal and regulatory violations also harmed the Company's stock.  It

9  was once a highly coveted bank stock owned by such esteemed investors as Warren

10  Buffet.  But the scandals, fines, and lack of proper corporate governance caused Wells

11  Fargo's stock to flatline from September 2016 to October 2019, when Scharf took over as

12  CEO.  Shares of rival JPMorgan Chase, in stark contrast, increased about 70% over that

13  time period, while Bank of America's stock almost doubled.

14        98.    As shown below, despite promises to the contrary, Wells Fargo's corporate

15  governance did not improve.

16      **E.**    **The False and Misleading 2020 Proxy**

17        99.    Wells Fargo's 2020 Proxy was filed on March 16, 2020.  The 2020 Proxy

18  was approved by Directors Black, Clark, Craver, Hewett, James, Morris, Noski, Payne,

19  Pujadas, Sargent, Scharf, and Vautrinot.  The Proxy told stockholders that the

20  Company's Performance assessment framework for executive compensation was

21  "robust," "overseen by our Board's Human Resources committee," and that it

22  considered "progress against diversity initiatives."  2020 Proxy Summary at v.  It stated

23  that the Board members responsible for D&I initiatives and results are Ronald Sargent,

24  Chair of the HRC Committee, as well as fellow members Hewitt, James and Morris.

25  2020 Proxy at 39.

26        100.   The 2020 Proxy also represented under the heading HUMAN CAPITAL

27  MANAGEMENT that "We Are Responsible for Leading Our Transformation" and that

28

1  the Board acknowledged that "we ALL have responsibility for managing risk EVERY
2  DAY." *See* 2020 Proxy at p. 51.

3      101.    DEI issues at this time were highly material to Wells Fargo's stockholders
4  because of the huge reputational hits Wells Fargo had already taken regarding its very
5  public scandals regarding racist policies.  In the 2020 Proxy, Wells Fargo announced a
6  slate of DEI initiatives, including programs to increase diverse representation in senior-
7  level job positions.  In the 2020 Proxy, the Director Defendants represented that Wells
8  Fargo was "dedicated to recruitment and career development practices that support our
9  employees and promote diversity in our workforce at all levels of our Company,
10  ***including leadership positions.***"

11      102.    The 2020 Proxy also contained a section entitled, "Our Commitment to Do
12  More to Increase Diversity in More Senior Roles," in which the Company represented
13  that:

> "Under the leadership of our CEO, Charlie Scharf, the following are some specific
14 actions we are taking . . . . We are requiring *diverse candidate slates and*
15 *interview teams* **for all roles** at Wells Fargo **with total direct**
16 **compensation of more than $100,000**," a reference to the Diverse Search
   Requirement."
17

18      103.    The statements in the 2020 Proxy were false and misleading because the
19  Proxy omitted highly material information – namely, the fact that the "interview teams"
20  would be conducting fake interviews of minority candidates for positions that had
21  already been filled in order to give the appearance, not reality, of serious strides towards
22  diversity.

23      **F.    The Board Touts the Success of the Diverse Search Requirement**
            **Even As the Board Continues to Receive Reports of Increased**
24          **Harassment and Discrimination at the Company**

25      104.    On May 25, 2020, George Floyd was killed at the hands of a white male
26  police officer.  Nationwide protests erupted over the mistreatment of Black Americans at
27  the hands of white police officers.  The protests broadened to include an examination of
28

1    other discrimination and mistreatment of all minorities and people of color, including

2    by corporate America.  Wells Fargo's corporate board minutes ████████████

3    ████████████████████████████████████████████████████████████████

4    ████████████████████████████████████████████████████████████████

5    ████████████████████████████████████████████████████████████

6    ████████████████████████████████████████████████████████████████

7    ████████████████████████████████████████████████████████████

8    ████████████████████████████████████████████████████████████████

9    ████████████████████████████████████████████████████████████████

10   ████████████████████████████████████████████████████████[34]

11        105.    Wells Fargo's officers and directors wanted to create *the appearance* that

12   Wells Fargo was doing something to attempt to make progress on its abysmal past track

13   record of diversity.  In a June 2020 memo to employees, CEO Charles W. Scharf pledged

14   to consider a wider array of candidates for jobs at the bank, but added that the bank

15   struggled to find qualified Black candidates.  He later apologized for the comment when

16   the memo became public in September 2020.  Scharf's comments were largely seen as

17   defensive and an attempt by Scharf and Wells Fargo to deflect blame for Wells Fargo's

18   failure to diversify its workforce by claiming that the problem was just that Wells Fargo

19   did not receive enough qualified job applications from minorities.

20        106.    Following widespread criticism of Mr. Scharf's tone-deaf comments,

21   Scharf himself issued a directive requiring Wells Fargo to adopt a formal policy

22   requiring that a diverse slate of candidates would have to be interviewed for all open

23   jobs paying more than $100,000 a year.

24        107.    Meanwhile, that August 2020, Wells Fargo paid nearly $8 million to settle

25   a claim by the Department of Labor that it had discriminated against more than 30,000

26   Black job applicants for positions in banking, sales and support roles.  Wells Fargo was

27

28        [34] WF_DS_000000802.

forced to settle the case in 2017 by agreeing to pay nearly $36 million to about 320 members of the class-action lawsuit, and pledging to "take actions designed to enhance opportunities for employment, earnings, and advancement of African American financial advisors and financial advisor trainees." As the lawsuit progressed, Wells Fargo began requiring that at least one woman or person of color needed to be interviewed for each open job, according to Raschelle Burton, a spokesperson for Wells Fargo. Burton represented that the policy was not written down and was only for certain senior positions.

108. That same month, Wells Fargo issued its 2020 ESG Report, in which the Company noted that, based on interviews with key stakeholders and stockholders, including the California State Teachers' Retirement System (CalSTRS), that DEI issues were a top priority for the Company's stockholders. The ESG Report stated that ***the topics "most significant to our internal and external stakeholder . . . [ included] . . . "[d]iversity and inclusion."***

109. On August 13, 2020, Wells Fargo's Risk Committee (comprised at the time by Directors Hewett, Morris, Pujadas, and Vautrinot) received a report ███████████ ████████████████████ from █████████, the Company 's █████████████.[35] Among other things, the report noted that ████████████████████████ ████████████████████████████████████████████████████ ████████████████████████. The report noted that the ██████████████ ████████████████████████████"[36]

110. On September 22, 2020, a Reuters article was published which made public for the first time Scharf's prior statement about the alleged lack of a Black talent pool. The report was entitled, "Exclusive: Wells Fargo CEO Ruffles Feathers with Comments About Diverse Talent," by Imani Moise, Jessica DiNapoli, and Ross Kerber.

---

[35] WF_DS_000000590.

[36] *Id.*

The article reported that CEO Charles Scharf had exasperated some Black employees in a Zoom meeting over the summer when he stated that the bank had trouble reaching its diversity goal because there was not enough minority talent, according to two participants cited by Reuters.  In his memo to Wells Fargo employees, Mr. Scharf said, "While it might sound like an excuse, the unfortunate reality is that there is a very limited pool of black talent to recruit from."

111.    The public disclosure of Defendant Scharf's improper comments caused several reputational damage to Wells Fargo.  A report prepared for ███████████ ███████ dated October 26, 2020, entitled ████████████████████████ ████████████"[37] noted that Scharf's comments caused ████████████████ ████████████████████████████████████████████ ██████"[38]  The report was provided to ████████████████████████████ ████████████████████████████████████████████ ████████████████  Scharf subsequently acknowledged that his "insensitive comment" reflected his "own unconscious bias."

112.    Despite these ongoing reports, the Board of Directors knowingly issued and/or approved false statements claiming success with respect to the Diverse Search Requirement and other DEI initiatives.  Written materials from a Wells Fargo ██████ ████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████."[39]  The materials noted that Wells Fargo ████████████ ████████████████████████████████████████ █ ████████████████████████████████████████████

[37] WF_DS_000001325.
[38] WF_DS_000001338.
[39] WF_DS_000000896.
[40] *Id.*

1    ███████████████████████████████████████████████████████████

2    ███████████████████████████████████████████████████████████

3    ██████████████████████

4         113.     On October 8, 2020, a report was presented to Directors Hewett, James,

5    Morris, and Sargent as members of the HRC.  The report was titled ████████████

6    ████████████████████████████████████████████████████████████

7    ████████ and it found that ████████████████████████████████████

8    ██████████████████████████████.[41]  The report noted that ██████

9    ██████████████████████████████████████████████

10    █████ The report also suggested that ███████████████████████████

11    ██████████████████████████████████.[42] ████

12    ████████████████████████████████████████████████████████

13    ██████████████████████████████████████████████████████

14    ████████████████████████████████████████████████████████████

15    ██████████████████████████████████████████████████

16    ████████████████.[43]

17         114.     During this time when Wells Fargo employees were orchestrating fake

18    interviews of minority candidates, the lack of adequate internal controls at Wells Fargo

19    also resulted in hundreds of Wells Fargo employees bilking the federal government out

20    of disaster relief funds meant to assist victims of the Covid-19 pandemic.  On October 15,

21    2020, it was reported that Wells Fargo had terminated between 100 and 125 employees

22    for whom it had been able to corroborate the fraud.  No details were provided as to

23    additional employees who were not terminated based on a lack of demonstrable

24    _____

25    [41] WF_DS_000001342.

26    [42] WF_DS_000001341 (noting that the ███████████████████████████

27    ████████████████████████████████████████████

28    [43] WF_DS_000001347.

evidence.  In a memo reporting the firings, Mr. Galloreese, who reports directly to CEO Sharf, said that the workers "defrauded" the Small Business Administration's Economic Injury Disaster Loan program which was designed to aid companies hurt by the coronavirus shutdown.[44]  Wells Fargo said it discovered that some of its employees got loans from the program through false representations to the federal government and then put the funds into their ***personal bank accounts***.

115.    On October 26-27, 2020, the Wells Fargo Board met for a regular board meeting, commencing at 4:45 p.m. E.S.T.  All members of the Board were present, including Scharf, Vautrinot, Black, Chancy, Clark, Craver, Hewett, James, Morris, Noski, Payne, Pujadas, and Sargent.[45]  At the October 26, 2020 meeting, Scharf provided an update to the Board regarding ████████████████████████

████ At the October 27, 2020 meeting, ████████████████████

████ presented a ████████████████████████████████

████████████████████████████████.[46]  In response to questions from directors, ████████████████████████████

████████████████████."[47]

116.    At the October 26-27, 2020 Board meeting, ████████████████

████████████████████████████████."[48] ████

████████████████████████████████████████

████████████████████████████████████

████████████ Defendant Scharf ████████████████████

---

[44] *See* Brian Dakss, "Wells Fargo Fires Dozens for Alleged Abuse of COVID Relief Program," CBS Money Watch, Oct. 15, 2020, available at https://www.cbsnews.com/news/wells-fargo-fires-dozens-for-alleged-abuse-of-covid-relief-program/, last visited May 2, 2023.

[45] WF_DS_000000640.

[46] WF_DS_000000651.

[47] *Id*.

[48] WF_DS_000001387.

1  ████████████████████████████████████████████████████████

2  ██████████ 49 ███████████████████████████████████████████████

3  ████████████████████████████████████████████████.

4      117.     In November 2020, Wells Fargo created a new position called Head of

5  Diverse Segments, Representation and Inclusion and hired Defendant Kleber Santos to

6  fill that position.  Wells Fargo's Board materials noted that Santos ████████████████

7  ████████████████████████████████████████████████████████████████

8  ██████████████████████████"50

9      118.     During the Relevant Time Period, the full Board received regular updates

10 on the Diverse Search Requirement.  For example, in November 2020, the Board of

11 Directors received a report ███████████████████████████████."51  The report

12 was prepared by ██████████████████████.  The Board was advised that ██████

13 ████████████████████████████████████████████████

14 ████████████████████████████.52  The Board was provided with ████████

15 ████████████████████████████████████████████████████████

16 ████████████████████████████████████████████████████

17 ████████████████████████████████████████████

18 ████████████████████████████████████████████

19 ██████  They also ████████████████████████████████

20 ██████.53  Opportunities were also identified for █████████████████████

21 ████████████████████████████████████████████

22

23

24  _____

25      49 *Id.*

26      50 WF_DS_000000357.

27      51 WF_DS_000001368.

27      52 WF_DS_000001371.

28      53 WF_DS_000001373.

1  ███████████████ ██ ██████████████████████████████████████
2  ████████████████████████.”[55]

3      119.    On November 16, 2020, the Wells Fargo Board held a regular meeting.  All
4  members of the Board were present.[56]  At the meeting, Scharf provided an update to the
5  Board regarding ████████████████████  At the meeting, Mr. Galloreese also
6  introduced ███████████████████████████████████████████████
7  ██████████████████████████. ██  provided a report to the Board on ██
8  ████████████████████████████████████████████████████████
9  █████████████████████████████████.[57]

10     120.    At the November 16, 2020 Board meeting, Board members were also
11  advised that, year-to-date, ███████████████████████████████████████
12  ████████████████████████████████████████████████████████
13  ████████████████████████████████████████████████.[58]

14     121.    At a November 17, 2020 meeting of the █████████████████████
15  ████████████████████████████████████████████████████████
16  ████████████████████████████████████████████████████
17  ██████████████████████████████████.[59]  They were also advised that
18  ████████████████████████████████████████████████████████
19  ████████████████████████████████████████████████████████
20  ███████████████████ ██ ██████████████████████████████████
21  ████████████████████████████████████████████████████████

---

[54] *Id.*
[55] *Id.*
[56] WF_DS_000000665.
[57] WF_DS_000000677.
[58] WF_DS_000000694.
[59] WF_DS_000001238.
[60] *Id.*

1

2

3

4 ."[61]  The Directors ███████ were

5 also advised of ██████████████████████

6

7

8

9

10

11 [62]

12       122.    Wells Fargo's Directors were also regularly advised during the Relevant

13 Time Period how much the lack of diversity was costing the Company.  For example,

14 Directors ██████████████████████████████

15

16

17 [63] ████████████████████████████████.[64]  The next year, in

18 a report dated December 14, 2021, the Directors were advised ████████████

19

20 [65]

21       123.    On January 25, 2021, Defendant Santos provided a report to the ███████

22 ████████████████████████████"[66]  The report

23 _____

24   [61] *Id.*

25   [62] WF_DS_000001240.

26   [63] WF_DS_000001241.

27   [64] WF_DS_000001261.

28   [65] WF_DS_000001450-51.

  [66] WF_DS_000000704.

noted ████████████████████████████████████████████
████████████████████████████████████████████████████
█████████████████  This report thus demonstrates the ██████████████████████████
████████████████████████████████████████████████ .

124.    Santos' January 25, 2021 report included a report on the ████████████
█████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████ .[67]

125.    At a February 22, 2021 ██████████████████████████████
████████████████████████████████████████████████ , the Directors reviewed and discussed a ██████████████████████████████████████
████████████████████████████████████████████████
██████████  The shareholder proposal requested that Wells Fargo undertake a racial equity audit, noting "Scharf's statement that he appointed white men to top jobs after arriving at WFC because of 'a very limited pool of Black talent,' demoralizing black employees, and the loss of black female top managers."[69] ████████████████████████
█████████████████████████████████████████████████████
███████████████████████████████████████████  The same day, the full Board met.  The minutes of the full Board meeting reflect the fact that ██████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

_____

[67] WF_DS_000000707.

[68] WF_DS_000000807.

[69] *See* 2021 Proxy at p. 119.

1 ███████████████████████████████████████████████████

2 ███████████████████████████████████[70]

3    126.    At a HRC meeting on February 23, 2021, Directors Hewett, James, Morris

4 and Sargent were told that ████████████████████████████████

5 ████████████████████████████████████████

6 ███████████████████████████████████████████████████

7 ███████████████.[71]

**G.    The Director Defendants Caused Wells Fargo to Issue a False and Misleading Annual Report on February 23, 2021 and a Materially Misleading Proxy Statement on March 16, 2021**

10    127.    On <u>February 23, 2021</u>, Wells Fargo filed its Annual Report on Form 10-K

11 with the SEC, reporting the Company's financial and operational results for the quarter

12 and year ended December 31, 2020 (the "2020 10-K"). The Annual Report stated that,

13 "[i]n 2020, we introduced a new set of expectations for everyone at the Company",

14 including, among other things, "[c]hampion[ing] diversity and inclusion", which "guide

15 how we lead ourselves, collaborate with our colleagues, and make decisions", and which

16 "apply to everyone at Wells Fargo, at every level, and in every role[.]"

17    128.    In the Annual Report, Defendant Scharf stated that, "[i]n the U.S., we are

18 requiring a diverse slate of candidates . . . for most roles with total direct compensation

19 of more than $100,000 per year."

20    129.    Wells Fargo's 2020 Annual Report also stated the following regarding the

21 Company's purported commitment to diversity and related hiring practices: "We are

22 dedicated to recruitment and career development practices that support our employees

23 and promote diversity in our workforce at all levels of our Company, including

24 leadership positions. *We have a strong record of recruiting, promoting, and*

25 _____

26    [70] WF_DS_000000821.

27    [71] WF_DS_000001260.

*rewarding women and racially/ethnically diverse employees at all levels of our Company, including a **commitment to increase diverse representation in leadership roles**.*"

130.    These statements in the 2020 Annual Report were false and misleading because the 2020 Annual Report omitted highly material information—namely, the fact that the "interview teams" would be conducting fake interviews of minority candidates for positions that had already been filled in order to attempt to manufacture "progress" on its attempts to rectify the lack of diversity in higher-level jobs.  The Annual Report failed to disclose the material fact, as later disclosed by Joe Bruno, that "HR recruiters[] tell the managers that you have to conduct these interviews, even though you have clearly explained that a candidate has already been sourced and selected."

131.    To attempt to demonstrate that Wells Fargo had successfully implemented its expanded Diverse Search Requirement, the 2020 10-K stated that as of December 31, 2020, "[o]ur global workforce was 54% female and 46% male, and our U.S. workforce was 56% female and 44% male", and that "[o]ur U.S. workforce was 55% Caucasian/white and 45% racially/ethnically diverse."  These statistics were misleading because it omitted the material information alleged above concerning the ███████

████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████

132.    On <u>March 16, 2021</u>, Wells Fargo filed a definitive notice and proxy statement with the SEC (the "2021 Proxy"), which stated, *inter alia*, that "[i]n the U.S., we are requiring a diverse slate of candidates—and a diverse interview team—for most roles with total direct compensation of more than $100,000 per year."

133.    The 2021 Proxy, similar to the Annual Report, stated that the Company's Directors had met with Wells Fargo's key stockholders and that DEI issues were highly material to stockholders' voting decisions.  The Proxy stated that "[s]ince 2010, we have

had an investor engagement program with independent director participation to help us better understand the views of our investors on key corporate governance and other topics."  To that end, "[s]ince our 2020 annual meeting, we contacted institutional investors representing approximately 35% of our outstanding shares and engaged with a significant number of our investors and other stakeholders to provide updates on the Company, discuss governance and other matters, and hear their perspectives."  Based on that feedback, the 2021 Proxy noted that top stockholder concerns included "Board [c]omposition [and] diversity," "Board oversight of risk and diversity & inclusion initiatives," and "ESG disclosures and practices."

134.    The 2021 Proxy stated in relevant part:

> "In consultation with the Board, Charlie [Scharf] has set clear priorities for the team and is driving our top priority — to continue strengthening the Company's risk and control foundation and addressing outstanding regulatory matters — with a sense of urgency."

135.    The 2021 Proxy announced the expansion of the Diverse Search Requirement, stating:

> Our Diverse Search Requirement was originally implemented based on our evaluation of the Company's workforce in order to determine how best to improve workforce diversity. Based on our ongoing review, the Company decided to ***expand the scope*** of the Diverse Search Requirement in 2020 as part of our *overall and continuing efforts to enhance workforce diversity*.

136.    Moreover, in an effort to convince stockholders that the Diverse Search Requirement was comprehensive and functioning well, the 2021 Proxy added new details about the program.  For example, it represented that Wells Fargo defined its "diversity dimensions" as including race/ethnicity, gender, LGBTQ individuals, veterans, and people with disabilities.  The Proxy also stated that the Diverse Search Requirement applied to virtually all United States job postings with direct compensation of at least $100,000.

137.    With respect to how Wells Fargo enforced its Diverse Search Requirement, the 2021 Proxy assured investors, in relevant part, that:

> Any exceptions to the Diverse Search Requirement *must be approved **by an Operating Committee member*** or one of their direct reports (or their assigned delegate). In order to obtain *approval for an exception*, hiring managers must show that ***sufficient outreach efforts were made*** (including the use of a variety of sourcing activities to identify diverse candidates) and that despite those efforts, they were unable to meet the Diverse Search Requirement.

138.    Due to Defendant Scharf's prior statement blaming the Company's lack of diversity on an alleged "lack of Black talent," some of the Company's largest institutional stockholders had also sent a letter to Wells Fargo in November 2020 requesting the inclusion of a stockholder proposal in the Proxy.  Three institutional stockholders—the Comptroller of the City of New York on behalf of the New York City Teachers' Retirement System, the AFL-CIO Reserve Fund, and the UAW Retiree Medical Benefits Trust, supported the inclusion of the proposal, which contained the following statement:

> As long-term shareholders, we are concerned that the lack of racial and ethnic diversity among the most senior ranks of the Company's executive management not only harms its financial performance, but also sets a poor tone at the top for diverse hiring processes throughout the Company.

139.    The institutional stockholders' proxy proposal included the following requested relief:

> RESOLVED: Shareholders request that the Board of Directors of Wells Fargo & Company (the "Company") adopt a policy for improving workforce diversity by requiring that the initial pool of candidates from which new employees are hired by the Company in the U.S. shall include at least one qualified woman and one ethnically or racially diversecandidate (a "Diverse Candidate Search Policy").[72]

140.    Wells Fargo's Board of Directors fought this proposal and lobbied the SEC in a December 26, 2020 letter to exclude it from the Company's 2021 Proxy.  Wells

---

[72] This type of proposal is sometimes referred to by corporate governance experts as the "Rooney Rule."

Fargo's letter to the SEC claimed that the Diverse Search Requirement was **stricter** than the above Proposal, claiming that "The Diverse Search Requirement Is Comprehensive," and assuring the SEC that there only were "limited exceptions" to the policy.

141.    In the letter, Wells Fargo represented that, "due to the importance of the Diverse Search Requirement, the Company has established governance processes relating to senior-level approval of any exception to the requirement for a specific role." The Board was successful in its lobbying efforts and the proxy proposal submitted by the Institutional Investors was successfully omitted from the Proxy.

142.    In the 2021 Proxy, a stockholder was successful in getting a proposal included in the actual Proxy which, if passed, would require the Company to conduct a "racial equity audit" to gather data on the Company's "adverse impacts on nonwhite stakeholders and communities of color." The Board, however, also recommended that stockholders reject this proposal. To support its opposition, the Board highlighted in the Proxy the success the Company had allegedly already achieved on its DEI initiatives, including the Diverse Search Requirement. The Proxy specifically mentioned Wells Fargo's Diverse Search Requirement hiring initiatives as a basis for rejecting the racial equity audit proposal, stating:

> Wells Fargo has taken a number of actions to promote and enhance diversity, equity, and inclusion goals within the Company and externally that include a focus on diverse workforce representation (including significantly increasing Black leadership) [and], accountability of senior management for progress in improving diverse representation and inclusion . . . .

143.    These actions and statements by Wells Fargo regarding its 2021 Proxy demonstrate the knowledge and active participation of the Company's senior executives and Board in the ongoing fraud with the Diverse Slate Program. The program was *directly supervised* by the Board's Human Resources Committee. Further, senior-level approval was necessary for any exception to the policy with respect to any specific job

opening.  Simply put, Wells Fargo cannot claim that the admitted fraud in the Diverse

Search Requirement interview program was that of an isolated, low-level employee.

Low-level employees did not orchestrate fake interviews on their own—they were told to

do so by management.  Because only the Company's senior executives could approve any

waiver for the interview requirements, fake interviews were implemented "top-down."

144.    During this time, CEO Scharf had repeatedly told investors that Wells

Fargo's top priority was the Company's internal controls, which he stated were effective

and adequate.  For example, on April 14, 2021, Wells Fargo issued a news release

reporting its first quarter 2021 results.  That news release quoted Scharf, who stated, in

relevant part:

> We are keenly focused on the priorities I outlined last quarter. Our
> work to build the appropriate risk and control environment remains our *top
> priority*. This is a multiyear effort and there is still much to do, but I am
> confident we are making progress, though it is not always a straight line. We
> are steadfast in our commitment to do this work which should ultimately
> satisfy our regulatory obligations[.]

145.    In April 2021, Wells Fargo published a report entitled, "2020 Social

Impact and Sustainability Highlights."  In it, Wells Fargo represented that "[o]ur

Diverse Search Requirement requires that for most U.S. roles with total direct

compensation greater than $100,000, at least 50% of interview candidates must be

diverse with respect to at least one diversity dimension."  The report also represented

that, as of December 31, 2020, "*91% of applicable requisitions had a diverse interview

slate*."

146.    On May 5, 2021, Wells Fargo filed a Form 10-Q for the quarter ended

March 31, 2021 (the "1Q21 10-Q").  That filing stated, in relevant part, that "Wells

Fargo's top priority remains meeting its regulatory requirements to build the right

foundation for all that lies ahead", and that, "[w]hile we still have significant work to do,

the Company is committed to devoting the resources necessary to operate with strong

business practices and controls, maintain the highest level of integrity, and have an appropriate culture in place."

147.    On May 10, 2021, Wells Fargo issued a news release entitled "Wells Fargo Joins OneTen Coalition to Hire, Upskill and Advance Black and African American Talent in the U.S." That news release stated, in relevant part:

> OneTen is a coalition "committed to ensuring that Black and African American talent with the skills and aptitude to earn success also have the opportunity to achieve success." OneTen's mission aligns with commitments set by Wells Fargo to create a more diverse, inclusive and equitable workforce at the company. These commitments include:
>
> • Increasing recruiting staff for outreach to diverse communities;
> • Partnering with senior leaders to enhance focus on recruiting, promotion and development programs for diverse talent;
> • Expanding participation in national diversity events, along with a commitment to potentially interview and hire on the spot;
> • Requiring senior leaders to identify and engage with external diversity focused organizations related to their line of business or function;
> • Increasing focus on skills-based hiring; and
> • Factoring DE&I [Diversity, Equity, and Inclusion] metrics into senior leader compensation.

148.    On May 26, 2021, Defendant Scharf highlighted the Diverse Search Requirement while testifying under oath before the United States Senate Committee on Banking, Housing, and Urban Affairs, stating that "for the hiring of many senior roles, we have implemented guidelines that require a diverse slate of candidates (at least 50 percent)." Scharf failed to disclose that Wells Fargo was staging fake interviews of minority candidates in order to pad its numbers and claim progress and success on the Diverse Search Requirement program.

149.    On June 29, 2021, Wells Fargo's Human Resources Committee of the Board of Directors held a meeting. Directors Hewett, Morris, and Sargent (Chair) participated. Directors Scharf, Noski, and Black also attended and participated in the meeting. The Directors were informed that █████████████████████████

1 ████████████████████████████████████████████████████

2 ████████████████████████████████████████████████

3 ██████████████████████████████[73]

4    150.    On July 15, 2021, Wells Fargo's Board approved the publication of the

5 Company's 2021 ESG Report, which stated that the topics "most significant to our

6 internal and external stakeholders" included "[d]iversity, equity, and inclusion."  The

7 report also stated that the Company "[r]equire[s] diverse candidate slates and interview

8 teams for key roles with total direct compensation of more than $100,000."  In this

9 same portion of the 2021 ESG Report, Wells Fargo also stated, "[i]n the U.S., we now

10 require that at least 50% of interview candidates identify with at least one diversity

11 dimension . . . for most roles with total direct compensation of more than $100,000."

12    151.    On October 26, 2021, the ████████████████████████

13 ████████████████████████████████████████████████████

14 ████████████████████████████████████████████████

15 ██████████████████████████████[74]  The Directors ████████████

16 ████████████████████████████████████████████████████

17 ██████████"[75]  They ████████████████████████████████████

18 ████████████████████████████████████████

19 ████████████  They were also presented with facts and information ████████████

20 ████████████████████████████████████████████████

21 ████████████████████████████████████

22

23

24 ─────────────────────

25    [73] WF_DS_000000862.

26    [74] WF_DS_000000914.  The Directors were informed that "overall intent to stay
continues to decline.    Mangers report an 11% higher intent to leave."
27 WF_DS_000000922.

   [75] *Id*. at 000914.
28

Verified Shareholder Derivative Complaint          - 47 -

1    █████████████████████████.[76]  They were also advised ███████████████

2    ████████████████████████████████.[77]

3         152.    The Directors continued to receive regular reports during the Relevant

4    Time Period concerning the Diverse Slate program.  In a report from ████████ dated

5    December 15, 2021 entitled ████████████████████████████████████

6    ██████"[78] the Directors were told that ███████████████████████████████

7    ████████████████████████████.[79] ████████████████████████

8    █████████████████████████████████████████████████████

9    ███████████████████████████████████████████████████████

10   █████████████████████████████████████████████████████████

11   ███████████████████████████

12        153.    On March 14, 2022, Wells Fargo filed its annual Proxy Statement.  The

13   Proxy was reviewed and approved by Directors Black, Chancy, Clark, Craver, Davis,

14   Hewett, Morken, Morris, Norwood, Payne, Pujadas, Sargent, Scharf, and Vautrinot.

15        154.    The 2022 Proxy stated:

16             *In November 2020, a new Operating Committee-level role*
17   *reporting directly to our CEO was created to lead DE&I efforts*.
     In this role, our Head of Diverse Segments, Representation and Inclusion
18   (DSRI) is responsible for driving a Company-wide DE&I strategy to increase
     diverse representation at all levels of the Company, create a more inclusive
19   workplace environment, and better serve and grow our diverse customer
     segments and diverse suppliers across all lines of business.  *In*
20   *partnership with our CEO and other members of the Operating*
     *Committee, including our Head of Human Resources, our line of*
21   *business CEOs and diverse segment teams, our Head of DSRI*
     *and his organization lead the DE&I priorities within our*
22   *Company* and the communities in which we operate.

23        155.    The 2022 Proxy also stated:

24   ─────────────────────────────

25   [76] WF_DS_000000915.

26   [77] *Id*.

27   [78] WF_DS_000002739.

28   [79] WF_DS_000002741.

Our DE&I commitments include a focus on hiring, promotions, and retention, and have been designed with increased accountability across those areas. These include:

| Diverse Candidates | Diversity Sourcing and Interview Team Guidelines that require diverse candidate Slate and interview teams for designated posted positions. We define diversity for these purposes to include the following diversity dimensions: race/ethnicity, gender, LGBTQ, veterans, and people with disabilities. |
|---|---|

156.    The Proxy also represented that the Board and HRC take into success when awarding executive compensation, the success or lack thereof in increasing diversity and success or lack thereof in improving the Company's risk management, with the HRC retaining discretion to reduce an executive's compensation to zero for failures in risk management:

> In determining NEO performance, the HRC utilizes a performance assessment and variable incentive determination process that ***provides the HRC with the ability to assess performance through the evaluation of pre-established financial and nonfinancial goals, including risk and DE&I. For DE&I, the HRC evaluates the CEO's progress on key Company-wide DE&I priorities, and for other NEOs, the HRC uses progress on diverse representation and inclusion across specific diversity dimensions of NEO leadership teams*** with potential adjustments to variable incentive compensation based on a holistic assessment of progress in one or more diversity dimensions. The performance assessment and variable incentive determination process aligns incentive compensation determinations with performance against long-term value drivers of the Company and prudent risk oversight, and ***provides the HRC with the ability to reduce an individual NEO's performance achievement level to zero for failures in risk management, including misconduct***.[80]

157.    The 2022 Proxy was false and misleading for failing to disclose the prevalent fake interviews that plagued the Diverse Slate program.  These fraudulent interviews posed a material risk to the Company and constituted a substantial failure of risk management, for which the Board and HRC had the discretion to reduce an executive's compensation to zero.  Instead of doing so, the Board and HRC continued to approve lavish compensation to the Company's executives and misrepresented the material failure of the Company's risk management controls in the Proxy.

---

[80] *See* 2022 Proxy at p. 72.

158.    In the 2022 Proxy, similar to the 2021 Proxy, the Board recommended that stockholders vote against a racial equity audit based on the Company's alleged success in the Diverse Search Requirement program stating, "[i]n 2021, Wells Fargo added a new DE&I executive performance objective for senior leaders that is directly connected to increasing gender, racial/ethnic representation in our executive ranks."

159.    Based on the Board's recommendation, stockholders voted against the racial equity audit proposal in both 2021 and 2022.

160.    The 2022 Proxy also asked stockholders to vote for election of the Directors and in favor of a "Say on Pay" Executive Compensation proposal.  In both instances, the Proxy extensively highlighted the Company's alleged success with respect to the Diverse Search Requirement program and the Company's alleged success in remediating the Company's internal controls as bases that supported the election of the Directors and approval of the executive compensation proposal.  The 2022 Proxy was false and misleading because the Proxy omitted highly material information – namely, the fact that the Company's "interview teams" were conducting fake interviews of minority candidates for positions that had already been filled in order to attempt to manufacture "progress" on Wells Fargo's attempts to rectify the lack of diversity in higher-level job positions that paid more than $100,000 per year.

## H.    The Individual Defendants are Awarded Improper Compensation Based on Alleged Success in Increasing Diversity

161.    During the Relevant Time Period, Defendant Scharf was compensated in part based on his alleged success in increasing diversity at Wells Fargo.  Scharf claimed success in this area despite the fact that the alleged success was predicated on misrepresented facts, such as the alleged success of the Diverse Search Requirement program.  These representations were false because, as noted herein, Wells Fargo was interviewing diverse candidates for jobs that had already been filled; as a result, the bogus interviews had no chance to increase diversity.  Scharf, who directly oversaw the program, nonetheless claimed victory so that he could line his pocket with additional

1  unmerited compensation.  For example, ███████████████████████████████

2  ███████████████████████████████████████████████████████████

3  ████████████████████████████████████████████████████████████

4  █████████████████████████████████████████████████████████████

5  ███████ .[81] Scharf's performance ████████████████████████████ ,"[82]

6  Scharf was described in the Board's description of his job responsibilities as ███████

7  ████████████████████████████████████████████████████████

8  █████████████████████████████████████████████

9  ███████████████████████████████████ ."[83]

10  162.    As a result of his supposed extraordinary success in leading DEI

11  initiatives, including the Diverse Search Requirement program, Scharf was awarded

12  $5,365,854 in incentive-based compensation for 2021, and total compensation of

13  $21,350,906, as reflected in the attached chart.  In total, from 2019 to 2021, Scharf was

14  awarded total compensation by Wells Fargo of $76,029,526:

| Name and Principal Position (a) | Year (b) | Salary ($) (c) | Bonus ($)[(1)] (d) | Stock Awards ($)[(2)(3)] (e) | Non-Equity Incentive Plan Compensation ($)[(4)] (f) | Total ($) (i) |
|---|---|---|---|---|---|---|
| Charles W. Scharf CEO and President | 2021 | 2,500,000 | — | 13,485,052 | 5,365,854 | 21,350,906 |
| | 2020 | 2,500,000 | — | 13,542,046 | 4,350,000 | 20,392,046 |
| | 2019 | 498,084 | 5,000,000 | 28,788,490 | — | 34,286,574 |

20  163.    Scharf hardly restored credibility with investors, employees, regulators

21  and the community by making statements that the Company's failure to meaningfully

22  increase diversity was due to the "very limited pool of Black talent" and by orchestrating

23  fake interviews of minority candidates in an effort to create a false impression of success

24  with the Diverse Search Requirement program.

26  [81] WF_DS_000000906.

27  [82] WF_DS_000000946.

28  [83] WF_DS_000000957.

164.    Those senior Wells Fargo executives who reported directly to Scharf were also awarded bonus or incentive compensation based on the supposed success of the Diverse Search Requirement fake interviews.  For example, ███████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ████████████████████████████████████████."[84]

165.    Defendant Scott Powell ███████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ████████████████████████████████████████████[85]

166.    Similarly, ████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ██████████████████████████████[86]

167.    Meanwhile, some key Wells Fargo employees who were members of the Operating Committee ████████████████████████████████████ ████████████████████████████████████████████████. ██ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ████████████████████████████████████. [87]

_____

[84] WF_DS_000000328.

[85] WF_DS_000000340.

[86] WF_DS_000000330.

[87] WF_DS_000000334.

168.    Similarly, ███████████████████████████████████████ ████████████████████████████████████ 88 ████ ███████████████████████████████████████ ███████████ .89

169.    ████████████████████████████████ ████████████████████████ %.90  Barry Sommers also "lagged the Company results for Level 3-6 diverse interview Slate (68.4% vs. 79.4%)."91

170.    Defendant ███████████████████████████ who was the Company's ███████████████████████████ ███████ , was also ████████████████████████████ ███████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████ ███████████████████████████████████ ██████92  During 2021, Weiss was the only Section 16 officer at Wells Fargo who did not receive a bonus.  He nonetheless received incentive compensation of $1,925,000.93

171.    However, Defendants ████████████████████ ████████████████████████████████████████ ██████████████████████████████ .94

172.    Throughout the Relevant Time Period, the compensation of Wells Fargo's senior executives was tied to their success in achieving DEI initiatives, including the

---

88 WF_DS_000000338.
89 WF_DS_000000342.
90 WF_DS_000000344.
91 WF_DS_000000346.
92 WF_DS_000000352.
93 *See* 2022 Proxy at p. 88.
94 WF_DS_000002746.

Diverse Search Requirement program.  Minutes from a meeting of the 

reflect a report to the Board from

I.    **The Truth Begins to Be Partially Revealed**

173.    Gradually, Wells Fargo employees started coming forward, claiming they were being forced by their supervisors to interview racially and ethnically diverse candidates for job openings that had already been filled.  The Wells Fargo employees called these interviews "fake interviews" or "sham interviews."

174.    Beginning in 2022, at least seven former Wells Fargo employees were identified and/or came forward; many more likely exist who have not come forward due to fear of retaliation.  *See* Emily Flitter, "At Wells Fargo, a Quest to Increase Diversity Leads to Fake Job Interviews," THE NEW YORK TIMES, May 19, 2022.

175.    One of those employees was Joe Bruno ("Bruno").  After complaining about the fake interview process, Mr. Bruno was fired by Wells Fargo.  On May 19, 2022, The New York Times published an article entitled "At Wells Fargo, a Quest to Increase Diversity Leads to Fake Job Interviews."  The article provided reports from Bruno and several other current and former employees in Wells Fargo's Wealth Management division about the Company's practice of conducting "fake" interviews.

176.    The New York Times reported that Bruno "said that he was often told to conduct interviews with Black candidates" and that in "most such cases, Wells had no intention of hiring those people because either he or his superiors had already picked

---

95 *See* WF_DS_000002004 & WF_DS_000002022-23.

1    someone for the job."  Mr. Bruno was a Market Leader and Senior Vice President in

2    Wells Fargo's Jacksonville, Florida office:

3        177.    The New York Times article also cited another employee, Tony Thorpe,

4    who said that he was told by his supervisors to reach out to historically

5    underrepresented individuals and create a paper record of having attempted to locate a

6    "diverse pool" of job candidates even when he knew the job positions had already been

7    filled.  The New York Times reported that it had spoken to 22 former and current Wells

8    Fargo employees, all of whom confirmed that they conducted fake interviews, helped

9    arrange fake interviews, were aware of fake interviews, were subject to fake interviews,

10   or saw paperwork documenting the fake interviews.  Moreover, the current and former

11   employees indicated that Wells Fargo conducted the sham interviews across multiple

12   business lines, including its Wealth Management, mortgage servicing, home lending,

13   and retail banking operations.

14       178.    The New York Times reported that "[i]n some instances, there were

15   written records of the practice of conducting fake interviews."  For example, "[i]n late

16   2020, just days after Wells Fargo offered a job to a person who counted as 'diverse' by

17   the bank's standards, a human resources employee asked that person to apply for a

18   different job at the bank, according to an email reviewed by The Times."  The article

19   noted that "[t]he first offer was still on the table, the Wells Fargo employee explained,

20   but the bank also wanted to show that it had 'qualified candidates' for both roles.

21   '***Simply book keeping for us,***' the employee wrote in the email."  A Wells Fargo

22   spokesperson confirmed to The New York Times that "***the bank kept records of***

23   ***every job interview***.  The record-keeping is necessary because the Office of the

24   Comptroller of the Currency, the nation's top banking regulator, conducts periodic

25   audits."

26       179.    Minority job candidates who were already unemployed and desperately

27   needed a new job to support themselves and their families, had their valuable time

28

wasted by Wells Fargo, which selfishly sought to burnish its damaged reputation by pretending to be mending its ways and interviewing more diverse candidates. The entire fake interview process merely served to further discriminate against minorities and cause them more damage.

180. Don Banks, an African American individual who was subjected to one of Wells Fargo's many "fake interviews," wrote an essay describing how Wells Fargo's intentional wrongdoing "made me feel less human." *See* Don Banks, "Wells Fargo Interviewed Me Just to Meet Its Diversity Criteria," BUSINESS INSIDER, June 22, 2022.

181. Wells Fargo initially and immediately attempted to discredit the reports and the whistleblowers. For example, a Company spokesperson told The Wall Street Journal that "[t]here is absolutely no reason why anyone would conduct a fake interview." Wells Fargo also tried to characterize any "fake" interviews as isolated acts of employees acting on their own, claiming, "[t]o the extent that individual employees are engaging in the behavior as described by The New York Times, we do not tolerate it." Wells Fargo also told reporters in the wake of The York Times' May 19 article that it had researched all of the specific claims reported in the article but could not corroborate them as factual.

182. On June 1, 2022, Wells Fargo published a report entitled, "Diversity, Equity, and Inclusion at Wells Fargo" (the "2022 DE&I Report"). The report continued Wells Fargo's pattern of misrepresentations about the Diverse Search Requirement, stating that, "[f]or most posted roles in the U.S. with total direct compensation greater than $100,000 per year, Wells Fargo requires that at least 50% of the interview candidates must represent a historically underrepresented group with respect to at least one diversity dimension."

183. Two days later, Defendant Kleber Santos doubled down on the Diverse Search Requirement in statements to Business Insider, claiming "[***t]he rule is working***." Shortly thereafter, however, on June 6, 2022 Wells Fargo abruptly

suspended the Diverse Search Requirement so that the Company's leaders could "study its use and make changes," "gain confidence that 'the guidelines live[d] up to their promise,'" and ensure "hiring managers, senior leaders and recruiters fully underst[oo]d how the guidelines should work."

184.    On June 5, 2022, Bruno, the Wells Fargo executive who had been quoted in the original May 19, 2022 New York Times article, posted a YouTube video in which he provided further details about the prevalent fake interview practices at the Company.[96]  Mr. Bruno detailed how for at least the past five years, Wells Fargo had either mandated or made a "best practice" of "add[ing] at least one diverse candidate to a pool of at least four candidates, for any job posted at the firm. The preference is Black/African Americans and women."

185.    Mr. Bruno stated in his YouTube video that "Adding fake interviews to the mix harms the very people that the DEI program is trying to assist."  He criticized Wells Fargo's management for merely checking boxes by having managers "conduct these interviews, even though you have explained that a candidate has already been sourced and selected."  Bruno also gave examples of three "fake interviews."  He described two financial consultant positions that were already filled and did not require additional candidates to be interviewed.  In both instances, Wells Fargo management mandated that fake interviews were conducted and that, as a 'best practice', one candidate needed to be diverse: preferably Black or a woman.

186.    In both instances, HR at Wells Fargo, backed up by senior leadership, requires that fake interviews of diverse candidates be conducted.  If these interviews are not conducted, the hiring manager cannot move forward with the hiring/restructuring.  No exceptions, they must be done by the manager.  Otherwise, the manager is not doing

---

[96] Available at https://www.youtube.com/watch?v=jopIT8m6-Rk, last visited May 5, 2023.

1   their job and can be removed from their position.  Under threat of removal, a manager is

2   compelled to comply.

3        187.    Mr. Bruno's YouTube video received many comments, both from Wells

4   Fargo employees who had witnessed similar misconduct or individuals who believed

5   they had been subjected to the fake interviews.  One post stated that "This hiring model

6   is not only followed within the Wealth Management Group but mirrors exactly how it's

7   done throughout the enterprise.  Including their retail banking division which holds the

8   majority of WF's work force."  Another post stated "I worked at Wells Fargo and Joe is

9   correct about what's happening with interviews."  Another from Judy Belton noted that

10  "For the past 4 years I have interviewed for various positions in Compliance and other

11  areas and I was rejected for all of them."  Another post from a Wells Fargo employee

12  stated:

13          "When I worked for WF it was an unwritten rule that the regional
        manager already filled job openings and *we would have to ask around if it*
14      *was a 'real' open position*. I remember being the most qualified for a
        role and being told that the other person had been waiting longer as the only
15      reason they got the role.  Hearing what you said they must have falsified my
        interview guide to reflect a lower score.  I also whistle blew on the fake
16      account scandal to the Charlotte Observer and got flown out to WF, NC HQ
        hub and out of all the execs in the meeting *Steve Bond, head of*
17      *compensation for Wells Fargo defended and obfuscated issues*
        *the most*.  That's when I knew that the top would never change their
18      warped perspective and how all the changes would not change the culture."

19

20       188.    Another major, material harm caused by the fake interviews was that the

21  minority candidates whose time was wasted by interviewing for positions that had

22  already been filled were prejudiced with respect to their future ability to be hired.  This

23  is an aspect of the fake interview scandal that has not received much attention or press,

24  as Wells Fargo continues to attempt to hide and conceal the full extent of its

25  wrongdoing.  But Joe Bruno explained this additional, material harm to minority job

26  candidates in his YouTube video, stating:

27          *The interview guides were falsified*, to make it look like the
        chosen candidate did better. A numerical value of 1 to 5 is given to each

28

candidate. ***The one that has been prechosen receives a 4 or 5. Everyone else receives a lower number, regardless if they did better or not***. ***The candidates that receive this fabricated number, now have a permanent record at the firm***, ***that they failed at this interview***. The qualitative part of the interview guide has language that states the candidate did not do as well as the chosen candidate. When a Black/African American candidate, or woman candidate, is subject to these fake interviews, and the interview guides are falsified, to make them look worse on paper than the chosen candidate, this is clearly morally and ethically wrong... and I would argue legally wrong also, for their civil rights are being broken based on the color of their skin or gender. ***When they come back to interview for another job at WF, there is a track record of failed attempts***.[97]

189.    Steve Bond was the head of Wells Fargo's branch banking strategy and compensation and was called out in the YouTube posts for defending the fake interviews.

190.    Mr. Bond had previously issued false claims about the "sales pressure being gone" at Wells Fargo a year after the fake account scandal first surfaced.  Local articles in North Carolina based on reports from Wells Fargo employees disputed Mr. Bond's declaration of victory, noting that the pressure remained.  *See* Deon Roberts, "A Year After Scandal, Sales Pressure Remains at Wells Fargo," The Charlotte Observer, Sept. 5, 2017 (citing reports from employees and a California attorney who said his office continues to hear from former Wells employees who describe sales pressure as remaining at the bank, even after the scandal arose).

191.    On June 9, 2022, The New York Times published a major follow-up article revealing that Defendants' prior efforts to characterize the fake interviews as isolated incidents were not true.  The New York Times article, entitled "Federal Prosecutors Open Criminal Inquiry Into Wells Fargo's Hiring Practices," disclosed that, since the prior May 19 article, the newspaper ***had spoken with ten additional current and former Wells Fargo employees who confirmed that "fake" interviews were***

---

[97] Available at https://www.youtube.com/watch?v=jopIT8m6-Rk, last visited May 5, 2023.

*prevalent throughout the Company*, and also occurred in many of the Company's other business lines, including the mortgage servicing, home lending, and retail banking businesses.

192. In response to this news, Wells Fargo's stock price fell more than 10%, declining from a closing price of $44.63 per share on June 8, 2022 to close at $40.08 on June 10, 2022—a loss of $17 billion in market capitalization.

193. On June 13, 2022, another article was published about the fact that the U.S. Attorney's Office for the Southern District of New York had launched a criminal probe into Wells Fargo's fake interview scandal. *See* Jeff Berman, "Wells Fargo in Criminal Probe Over Fake Job Interviews," THINKADVISOR, June 13, 2022. In response to news of the criminal investigation, a Wells Fargo spokesperson stated: "No one should be put through an interview without a real chance of receiving an offer, period." Wells Fargo added: "The diverse slate guidelines we put in place are meant to increase diverse representation across the company and we can see meaningful results in our hiring data since 2020. At the same time, it's important that implementation of our guidelines is consistent. Earlier this week, the company temporarily paused the use of its diverse slate guidelines."

194. In the same article disclosing the criminal probe, Wells Fargo stated that it is "conducting a review so that hiring managers, senior leaders and recruiters fully understand how the guidelines should be implemented — and so we can have confidence that our guidelines live up to their promise."

195. Fortune also ran a major article about the scandal. *See* Dan Reichl, "Wells Fargo is Under Federal Investigation for Conducting Fake Interviews of Minority Candidates," FORTUNE, June 9, 2022. The Fortune article noted that employees in Wells Fargo's wealth management division reported that their supervisors had instructed them to interview minority candidates for job positions that had already been filled in an attempt to satisfy Wells Fargo's in-house interview quota system.

196.    On June 28, 2022, Congresswoman Waters sent a letter to the Federal Reserve, the United States Department of Housing & Urban Development, the Federal Deposit Insurance Corporation, the CFPB, and the OCC asking them to investigate Wells Fargo over recent allegations that Wells Fargo discriminated against African American borrowers and for conducting fake interviews with minority candidates in order to misrepresent the Company's DEI metrics.

197.    Congresswoman Waters' letter stated in part:

> The New York Times reports that Wells Fargo staff have inflated their diversity, equity, and inclusion data by conducting "fake" interviews with women and candidates of color.  According to the article, the interviews "seemed to be more about helping Wells Fargo record its diversity efforts on paper—partly in anticipation of possible regulatory audits— rather than hiring more women or people of color." Recently, The New York Times also reported that federal prosecutors are investigating these "sham" interviews and if federal laws were violated. To be clear, ***commitments to diversity, equity, and inclusion are not stunts to be taken advantage of by megabanks; diversity, equity, and inclusion encompass aspects of both moral and legal obligations that financial institutions hold. It is unacceptable that Wells Fargo would mislead applicants and the public***.

198.    Meanwhile, analysts were penning reports expressing concern that Wells Fargo's unlawful conduct and governance failures would prevent the Company from obtaining relief from the Asset Cap.  On June 29, 2022, Deutsche Bank issued an analyst report stating that although it still had "optimism that the asset cap will be lifted in the next 6-9 months," "our conviction is lower than a few months ago given various headlines involving WFC as well as risk mgmt issues."  In another analyst report entitled "Where We Stand On The Asset Cap; 2H Update; Reiterate BUY,"  Deutsche Bank stated that "WFC remains under an asset cap put in place by bank regulators back in February 2018" which has "limited the ability to gather deposits and grow the capital markets business" and also resulted in "higher costs to address regulatory issues and likely some other foregone revenue . . . as mgmt and staff prioritize improving risk mgmt and other issues potentially at the cost of revenue . . . ." It further noted that "[p]er WFC's 2Q 10Q, government regulators (including the DOJ) are looking into Wells' hiring practices

1  related to diversity." Deutsche Bank's analyst report also observed that "[i]t's still

2  anyone's guess on when the asset cap will be lifted, but we do know that the regulators

3  think Wells is making progress …but we also know that challenges/issues (such as hiring

4  practices) continue."[98]

5      199.  In the summer of 2022, Wells Fargo was sued in San Francisco in a class

6  action complaint alleging discrimination in lending.  In March 2022, a Bloomberg

7  investigation found that Wells Fargo approved fewer than half of Black homeowners'

8  mortgage refinancing applications in 2020, compared with 72% of white applicants.

9      200.  Bloomberg's analysis also demonstrated that Wells Fargo discriminated

10  against other minorities.  It only approved 53% of Hispanic borrowers' applications and

11  67% of Asian applications.  Other banks approved minority applications at a much

12  higher rate: 87% of White refinancing applications; 85% of Asian applications; 79% of

13  Hispanic applications; and 71% of Black applications.[99]  Bloomberg's data demonstrated

14  that Wells Fargo had the biggest disparity between Black and White approval rates

15  compared to any other bank.  Bloomberg noted that Wells Fargo had the dubious

16  distinction of being "alone in rejecting more Black homeowners than it accepted."

17      201.  On August 1, 2022, Wells Fargo filed a Form 10-Q with the SEC for Q2

18  2022.  In it, the Company confirmed that the DOJ was investigating its Diverse Slate

19  hiring practices: "Government agencies, including the United States Department of

20  Justice, have undertaken formal or informal inquiries or investigations regarding the

21  Company's hiring practices related to diversity."

22      202.  On August 2, 2022, just a few months after articles exposing its fake

23  interview scandal, Wells Fargo announced that it was resuming its interview quota

---

25      [98] Ellipsis in original.

26      [99] Bloomberg cited statistics from other major banks:  JP Morgan approved 81% of refinancing applications from Black homeowners in 2020 compared to 90% from White homeowners; Bank of America approved 78% of White applications compared to 66% from Black applicants; Rocket Mortgage approved 86% of White borrowers compared to 79% of Black applicants.

system, with modifications designed to "prevent abuse," thus effectively conceding the wrongdoing.  *See* Hannah Lang, "Wells Fargo Reinstates Diversity Hiring Guidelines After Report of 'Fake' Job Interviews," THE CHARLOTTE OBSERVER, Aug. 2, 2022.

203.    The New York Times reported that in an internal memo announcing the reinstatement, Wells Fargo revealed that after "talking to employees" it had "[o]verwhelmingly [] heard the need to improve the candidate and manager experience."  As a result, Wells Fargo conceded that it needed to add "new features" to the policy "to prevent abuse."  This included, among other changes, "increased training for managers" and "an easier approval process for exemptions to the diverse slate requirement."  Moreover, rather than a hard rule of requiring a 50% diverse candidate slate for positions with compensation over $100,000, it now became more vague and ambiguous.  The Diverse Search Requirement would now apply to roles that were "in-scope" based on unspecified job levels, not compensation.

204.    In September 2022, Senators Bob Menendez, Sherrod Brown, and Elizabeth Warren sent a letter to Scharf and Wells Fargo's Senior Vice President and Head of Human Resources ("HR"), Bei Ling, noting their "deep concern regarding recent reports that Wells Fargo conducts 'fake interviews' with women and minority candidates for positions that ha[d] already been filled."  The Senators further stated that the Company's fake interview practices were "not only highly offensive and suggestive of systemic bias and discrimination at the bank, but also may represent a pattern of misleading shareholders."

205.    On September 13, 2022, after years of urging its shareholders to vote against racial equity audits, Wells Fargo announced that it had agreed to "commission an external, third-party racial equity audit" by law firm Covington & Burling LLP.  Wells Fargo stated that the audit would "focus on elements of Wells Fargo's efforts to serve diverse communities and promote a diverse workforce."

206.    The announcement came shortly before Defendant Scharf was scheduled to testify before congressional committees about the Company's fake interviews.  On September 13, 2022, Bloomberg published an article entitled, "Wells Fargo Commits to Racial-Equity Audit Ahead of Hearings," noting that Wells Fargo "urged shareholders to vote against a shareholder-proposed racial-equity audit earlier this year and last year, arguing that it was already committed to advancing diversity, equity and inclusion. On both occasions, shareholders rejected the proposals."

207.    On September 21, 2022, Defendant Scharf testified before the United States House of Representatives Committee on Financial Services in a hearing entitled, "Holding Megabanks Accountable: Oversight of America's Largest Consumer Facing Banks.  During the hearing, Congresswoman Waters, who had previously called for the investigation, questioned Defendant Scharf about the fake interviews of minority candidates, asking "[i]s it true that you interviewed an African-American employee for a position after you had already hired a white employee? Is that true?"  In response, Scharf stated: "We are in the middle of continuing an investigation to make sure that we understand every instance where people felt as if they were not treated fairly, and if we have findings, we will take appropriate action."

208.    On September 22, 2022, United States Senator Bob Menendez (D-N.J.), Chairman Sherrod Brown (D-Ohio), and Senator Elizabeth Warren (D-Mass.) issued a press release entitled, "Menendez, Brown, Warren Hold Wells Fargo Accountable for Conducting Misleading Interviews with Women and Minority Candidates."  The press release stated in part that:

> We write with deep concern regarding recent reports that Wells Fargo conducts "fake interviews" with women and minority candidates for positions that have already been filled. According to the New York Times, Wells Fargo undertakes these fake interviews to artificially boost diversity statistics in an attempt to satisfy an internal goal to interview at least one woman and one person of color for each open position—a goal that was meant to increase diversity among Wells Fargo's workforce. ***The information uncovered by The New York Times is not only highly offensive and suggestive of systemic bias and discrimination at the bank, but also may represent a pattern of***

1
2

***misleading shareholders and federal and state regulators in oversight of Wells Fargo's execution of nondiscrimination laws and broader, public commitment to diversity, equity, and inclusion***.

3    209.   On October 31, 2022, Wells Fargo filed its Form 10-Q quarterly report, in

4  which it disclosed that, in addition to the DOJ, ***the SEC was also investigating the***

5  ***Company's hiring practices related to diversity***.  Analysts linked this disclosure

6  about the fake interview scandal to the Company's ability to finally shed the asset cap

7  that was burdening the Company.  For example, Deutsche Bank noted in a November 6,

8  2022 analyst report that "[i]t seems logical (to us, at least) that the above issues need to

9  be resolved before the Fed lifts the asset cap."

10    210.   In a November 16, 2022 analyst report entitled, "Question Bank: Key

11  Issues and Questions Surrounding WFC, Deutsche Bank wrote that "WFC disclosed in

12  the second quarter 10Q that the DOJ was investigati[ng] hiring practices related to

13  diversity.  In the third quarter 10Q, WFC noted that the SEC is also investigating on the

14  same issue." The Deutsche Bank report further stated that "[i]t seems logical (to us, at

15  least) that ***the above issues need to be resolved before the Fed lifts the asset***

16  ***cap***."

17
18

**J.     The Board Had Direct Oversight of the Diverse Slate Program but Failed To Take Action After It Became Aware Of Fraud In The Program**

19    211.   Wells Fargo's Human Resources Committee had direct oversight of the

20  Diverse Slate Program.  Defendants Sargent, Black, Hewett and Morris served on the

21  HRC during the relevant time period.  According to its charter, the HRC's

22  responsibilities include the following:

23
24
25
26

**Human Capital Risk and Human Capital Management**. The HRC shall oversee the Company's human capital risk and human capital management, including performance management; talent management; diversity, equity, and inclusion; pay equity; and succession planning for the CEO and other senior executives as determined by the HRC.

27
28

212.    Wells Fargo's **Governance and Nominating Committee** also had oversight responsibility related to the Diverse Search Requirement program.  The Governance and Nominating Committee is responsible for "reviews and assesses our governance practices," "oversees an annual evaluation of the performance of our Board and its Committees," and "Oversees our Company's engagement with shareholders and other interested parties concerning governance matters and works with our Board's other committees in connection with shareholder engagement on matters subject to the oversight of such other Committees."  *See* 2022 Proxy at p. 27.  Thus, the Governance and Nominating Committee had frequent interaction with the other Board committees, including its evaluation of the performance of the other committees, which necessarily includes its evaluation of the Human Resources Committee.

213.    In addition, the Governance and Nominating Committee, as a result of its "work with other committees" on "shareholder engagement on matters subject to the oversight of such other Committees," had contact with shareholders who contacted the Committee about the work of the HRC on the Diverse Search Requirement .

214.    The **Risk Committee** has authority for risk assessment and management, as well as internal controls, including reputational risks.  The conduct underlying the Diverse Search Requirement, including conducting "fake interviews," has certainly resulted in significant reputational harm to WFC and thus the Risk Committee had oversight responsibility over aspects and/or effects of the Diverse Search Requirement.

215.    Information about problems with the Diverse Search Requirement program was brought to the Board's attention, but the Board failed to take necessary action and ███████████████████████████████████████████ ██████████████████████████████████████. For example, ████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████

1 █████████████████████████████████████████████████

2 ██████████████████████████████████████████████████

3 ███████████████████████████████████████████████████

4 ██████████████████████████ ██ The Black applicant, who was interviewing for

5 the position of Executive V.P.  of Merchant Services, alleged ████████████████

6 ███████████████████████████████████████████████

7 ██████████████████████████████████████████

8 ███████████████████████████████████████████████████

9 ████████████████████████████████████ in accordance with the

10 Diverse Slate program.[101]  The complainant also stated that ██████████████████

11 ████████████████████████████████.[102]  The complaint was

12 filed under the categories of Race/National Origin/Color. ███████████████████

13 ████████████████████████████████████████████████████████

14 ████████████████████████████████████████████████████████

15 ███████████████████████████████████████████████████████

16 █████████████████████████████████████████████████████████

17 ████████████████████████████████████████████████

18 ████████████████████████████████████[103]

19     216.    In response to the complaint, Wells Fargo did not ████████████████

20 ██████████████ ██ ████████████████████████████████████████

21

22 _____

23 [100] ████████████████████████████

24 [101] *Id.  See also* ██████████████████████████████

25 [102] █████████████████████████████████████████████████████████████

26 ████████████████████████████████████████████████████████████████████ last visited Mar. 27, 2023.

27 [103] ████████████████████████████████████

28 [104] ████████████████████████████

1    ███████████████████████████████████████[105]████████████

2    ████████████████████████████████████████████

3    █████████████████████████████████████████████

4    ███████████████████████████████████████████

5    ████████████████████████████████████████████████

6    █████████████████████████████████████████████

7    █████████████████████████████████████████████

8    ███████████████████████████████████████████

9    █████████████████████████████████████████████

10   █████████████████████████████████████████████

11   ████████████████████████████████████████████

12   █████████████████████████████████████████████

13   ████████ ██ █████████████████████████████████████d

14   ████████████████████████████████████████████

15   ████ nt.  In addition, "████████████████████████████

16   ████████████████████████."[107]  Despite all this, Wells Fargo

17   ██████████████████████████████████████████████

18   █████████████████████████████[108]

19       217.    At a June 28, 2022 ██████████████████████ meeting, which

20   was attended by ██████████████████████████, the Directors were given a

21   ██████████████████████████████████████████

22   ████████████████████████████████████████

23   █████████████████████████████████████████

24   _____

25       [105] *Id.*

26       [106] WF_DS_Supp_000000005.

27       [107] *Id.*

28       [108] WF_DS_Supp_000000006.

1  ██████████████ .[109] ███████ provided the Directors with written materials and

2  graphs showing that ██████████████████████████████

3  ██████████████████████████████████████████

4  ██████████████████████████████████████████████

5  Wells Fargo was hiring just 2% of Black candidates, as reflected in the following chart:

6

7

8



9

10

11

12

13  218.  In addition, the percentage of ████████████████████

14  ██████████████████████████████████████████████

15  ██████████████████████████████████████████████

16  ██████████████ as reflected in the following chart:[110]

17

18

19



20

21

22

23

24

25

26  _____

27  [109] WF_DS_000002847.

28  [110] WF_DS_000002848.

219.    The Directors knew this or recklessly disregarded the written information provided to them.  They further failed to take necessary action to address the fake interview fraud when presented with this written information.

220.    At the same June 28, 2022 HRC Committee meeting, the Directors were also informed of ███████████████████████████████████████████ ████████████████████████████████████████████ ███████████████████████████████████████████████ ████████████████████████████████████████ [111] The Directors were also advised that ████████████████████████████ ██████████████████████████████████████████ ████████ ██ █████████████████████████████████ ██████████████████████████████████████ ████████████████████████████████████████████ █████████████████████████████████████████████ workers. [113]

## K.    The Board of Directors Caused Wells Fargo to Repurchase Its Stock at Inflated Prices, Causing Over $7.14 Billion in Damages

221.    During the relevant time period, Wells Fargo was engaging in massive repurchases of its own stock at inflated prices.

222.    In July 2019, the Board of Directors authorized the repurchase of 350 million shares of WFC common stock.

223.    In January 2021, the Board of Directors authorized the repurchase of an additional 500 million shares of WFC common stock.

---

[111] WF_DS_000003230.

[112] WF_DS_000003235.

[113] *Id*.

224.    At December 31, 2021, Wells Fargo had remaining Board authority to repurchase approximately 361 million shares of common stock.

The following table shows Company repurchases of its common stock for each calendar month in the quarter ended June 30, 2021:

| Calendar month | Total number of shares repurchased (1) | Weighted average price paid per share | Maximum number of shares that may yet be repurchased under the authorizations |
|---|---|---|---|
| April | 20,075,596 | $ 43.60 | 629,954,518 |
| May | 10,893,389 | 46.11 | 619,061,129 |
| June | 4,354,796 | 43.08 | 614,706,333 |
| Total | 35,323,781 | | |

225.    The following table shows Company repurchases of its common stock for each calendar month in the quarter ended September 30, 2021:

| Calendar month | Total number of shares repurchased (1) | Weighted average price paid per share | Maximum number of shares that may yet be repurchased under the authorization |
|---|---|---|---|
| July | 34,420,000 | $ 41.37 | 250,601,709 |
| August | 45,950,000 | 44.58 | 250,555,759 |
| September | 36,667,000 | 43.40 | 250,519,092 |
| Total | 117,037,000 | | |

226.    The following table shows Company repurchases of its common stock for each calendar month in the quarter ended December 31, 2021:

| Calendar month | Total number of | Weighted-average price paid per share | Maximum number of shares that may yet |
|---|---|---|---|

| | shares repurchased (1) | | be repurchased under the authorizations |
|---|---|---|---|
| October | 36,092,310 | 50.07 | 464,405,588 |
| November | 80,585,475 | 50.66 | 383,820,113 |
| December | 23,001,846 | 48.79 | 360,818,267 |
| Total | 139,679,631 | | |

227.    The following table shows Company repurchases of its common stock for each calendar month in the quarter ended March 31, 2022.

| Calendar month | Total number of shares repurchased (1) | Weighted average price paid per share | Maximum number of shares that may yet be repurchased under the authorization |
|---|---|---|---|
| January | 33,687,433 | $ 54.55 | 327,130,834 |
| February | 55,819,880 | 56.79 | 271,310,954 |
| March | 20,586,039 | 49.07 | 250,724,915 |
| Total | 110,093,352 | | |

228.    The following table shows Company repurchases of its common stock for each calendar month in the quarter ended June 30, 2022.

| Calendar month | Total number of shares repurchased (1) | Weighted average price paid per share | Maximum number of shares that may yet be repurchased under the authorization |
|---|---|---|---|
| April | 24,862,000 | $ 47.54 | 250,700,053 |
| May | 25,465,000 | 43.63 | 250,674,588 |
| June | 38,459,000 | 42.45 | 250,636,129 |
| Total | 88,786,000 | | |

229. The following table shows Company repurchases of its common stock for each calendar month in the quarter ended September 30, 2022:

| Calendar month | Total number of shares repurchased (1) | Weighted average price paid per share | Maximum number of shares that may yet be repurchased under the authorization |
|---|---|---|---|
| July | 34,420,000 | $ 41.37 | 250,601,709 |
| August | 45,950,000 | 44.58 | 250,555,759 |
| September | 36,667,000 | 43.40 | 250,519,092 |
| Total | 117,037,000 | | |

230. The following table shows Company repurchases of its common stock for each calendar month in the quarter ended December 31, 2022:

| Calendar month | Total number of shares repurchased (1) | Weighted-average price paid per share | Maximum number of shares that may yet be repurchased under the authorization |
|---|---|---|---|
| October | 52,876,000 | $ 43.67 | 250,466,216 |
| November | 43,423,000 | 46.77 | 250,422,793 |
| December | 32,959,000 | 42.94 | 250,389,834 |
| Total | 129,258,000 | | |

(1)All shares were repurchased under an authorization covering up to 500 million shares of common stock approved by the Board of Directors and publicly announced by the Company on January 15, 2021.

224. The following table shows Company repurchases of its common stock for each calendar month in the quarter ended March 31, 2023.

| Calendar month | Total number of shares repurchased (1) | Weighted average price paid per share | Maximum number of shares that may yet be repurchased under the authorization |
|---|---|---|---|
| January | 22,215,680 | $    44.47 | 228,174,154 |
| February | 47,552,452 | 47.47 | 180,621,702 |
| March | 16,617,428 | 46.36 | 164,004,274 |
| Total | 86,385,560 | | |

225.    Since the time Wells Fargo spent billions of dollars repurchasing such shares, Wells Fargo's stock has declined substantially in response to the adverse news regarding Wells Fargo's fake interviews of minority candidates.  On May 5, 2023, Wells Fargo's stock closed at $37.94 per share.  Wells Fargo has thus been substantially harmed by repurchasing its shares at inflated prices. The damages total approximately $7.148 billion, as follows:

a.    Q2 2021: Using the weighted average price paid by Wells Fargo for the Q2 2021 repurchases from the chart above, compared to the May 5, 2023 closing price of Wells Fargo stock of $37.94, Wells Fargo was harmed in the amount of over $225,010,512 in Q2 2021.

b.    Q3 2021:  Using the weighted average price paid by Wells Fargo for the Q3 2021 repurchases from the chart above, compared to the May 5, 2023 closing price of Wells Fargo stock of $37.94, Wells Fargo was harmed in the amount of over $623,370,420 in Q3 2021

c.    Q4 2021: Using the weighted average price paid by Wells Fargo for the Q4 2021 repurchases from the chart above, compared to the May 5, 2023 closing price of Wells Fargo stock of $37.94, Wells Fargo was harmed in the amount of over $1.69 billion in Q4 2021.

1    d.    Q1 2022:  Using the weighted average price paid by Wells Fargo for the Q1

2  2022 repurchases from the chart above, compared to the May 5, 2023 closing price of

3  Wells Fargo stock of $37.94, Wells Fargo was harmed in the amount of over $1.84

4  billion in Q1 2022.

5    e.    Q2 2022:  Using the weighted average price paid by Wells Fargo for the Q2

6  2022 repurchases from the chart above, compared to the May 5, 2023 closing price of

7  Wells Fargo stock of $37.94, Wells Fargo was harmed in the amount of over

8  $557,021,140 in Q2 2022.

9    f.    Q3 2022:  Using the weighted average price paid by Wells Fargo for the Q3

10  2022 repurchases from the chart above, compared to the May 5, 2023 closing price of

11  Wells Fargo stock of $37.94, Wells Fargo was harmed in the amount of over

12  $623,370,420 in Q3 2022.

13    g.    Q4 2022:  Using the weighted average price paid by Wells Fargo for the Q4

14  2022 repurchases from the chart above, compared to the May 5, 2023 closing price of

15  Wells Fargo stock of $37.94, Wells Fargo was harmed in the amount of over

16  $851,199,570  in Q4 2022.

17    h.    Q1 2023:  Using the weighted average price paid by Wells Fargo for the Q1

18  2023 repurchases from the chart above, compared to the May 5, 2023 closing price of

19  Wells Fargo stock of $37.94, Wells Fargo was harmed in the amount of over

20  $738,162,002  in Q1 2023.

21    **L.    The Defendants Failed to Perform Any Investigation of Whether
       Executive Compensation should be Clawbacked in Light of the
22     DEI fraud**

23    226.    In 2021, Wells Fargo implemented a major and material amendment of its

24  executive compensation Clawback Policy in an attempt to protect the Company and its

25  stockholders and stakeholders from the avaricious, greedy misconduct of its executives.

26  The primary impetus was the huge financial and reputational harm caused to Wells

27  Fargo by the now infamous "fake account" scandal, pursuant to which the Company's

28

senior executives had made substantial incentive compensation from pressuring lower-level employees to open fake accounts without customer knowledge or authorization. The senior executives made more money based on the reported increased number of opened accounts, but the Company and its stockholders were left to pay for the billions of dollars in fines, penalties, reputational harm, and continued imposition of the Asset Cap. *See, e.g.*, Jack Kelly, "Wells Fargo Forced to Pay $3 Billion For The Bank's Fake Account Scandal," FORBES, Feb. 24, 2020 ("Wells Fargo, the fourth largest bank in the United States, agreed on Friday to pay $3 billion to settle its long-running civil and criminal probes into the heinous accusations of rampant fraudulent sales practices.").[114]

227.    Wells Fargo touted its vastly expanded Clawback Policy in its subsequent Proxy Statements as a tool that it was actively enforcing in order to improve its risk management procedures and internal controls.  For example, the 2021 Proxy stated that:

> We discouraged excessive risk-taking through risk-balancing features and an <u>enhanced Clawback and Forfeiture Policy</u> that <u>expands the individuals and compensation subject to forfeiture</u> or recovery and maintains an expansive set of circumstances that can trigger forfeiture or recovery.[115]

228.    The Proxy further stated that Wells Fargo:[116]

| Adopted New Clawback and Forfeiture Policy | Adopted a Clawback and Forfeiture Policy that significantly strengthens the Company's ability to hold named executives and other employees accountable for misconduct or risk events through forfeiture or recovery of compensation under appropriate circumstances. See *5. Risk Management and Accountability* for further detail. |
|---|---|

---

[114] Available at https://www.forbes.com/sites/jackkelly/2020/02/24/wells-fargo-forced-to-pay-3-billion-for-the-banks-fake-account-scandal/?sh=70ba5e642d26, last visited May 6, 2023.

[115] *See* 2021 Proxy Statement at p. 65.

[116] *Id.* at 68.

229.  The 2021 Proxy also included additional detailed statements and graphs touting the enhanced, expanded Clawback Policy as a key part of the Company's enhanced "Risk Management and Accountability," as reflected in the following chart:



**5  Risk Management and Accountability**

- Risk-balancing features discourage excessive risk-taking, such as a majority of variable compensation in long-term equity
- Enhanced Clawback and Forfeiture Policy to strengthen our ability to forfeit and recover compensation under appropriate circumstances

| Compensation Subject to Forfeiture or Recovery | | |
|---|---|---|
| Cash Bonus | Unvested Equity | Vested Equity |
| ✓ | ✓ | ✓ |

230.  The 2021 Proxy further took pains to emphasize and stress that the new, enhanced Clawback Policy would result in clawback and forfeiture of all three major type of compensation awarded to its senior executives and Operating Committee members, as reflected in the following detailed chart from the Proxy:

| Pay Element | | Purpose & Design Features | Performance Metrics |
|---|---|---|---|
| Fixed | Base Salary | • Intended to provide market-competitive pay to attract and retain named executives<br><br>• Reflects each executive's experience and level of responsibility | |
| Performance-Based Variable Compensation | Cash Bonus | • Rewards executives for achievement of annual goals (see *2. Performance Assessment and Compensation Determination Framework*)<br><br>• 2020 target and maximum award opportunities of 200% and 300% of salary for Mr. Scharf and 100% and 150% of salary for other executives<br><br>• Award paid in cash, in first quarter of following year | *Award level* based on achievement of annual objectives, including:<br><br>• Company Performance;<br><br>• Individual Performance; and<br><br>• Risk Accountability<br><br>• ██████████ |
| | Performance Shares | • Reinforces a shared success culture and encourages executives to deliver sustained shareholder value<br><br>• *Grant value* based on achievement of annual objectives (same objectives as annual cash bonus)<br><br>• *Payout level* based on absolute performance over a three-year performance period, with HRC consideration of other factors set forth in the adjustment provision<br><br>• Number of shares earned based on achievement level, with payout ranging from 0% to 150% of target<br><br>• Subject to robust holding requirements (updated in 2020) while an Operating Committee member until one year after retirement[2] | *Grant value* based on achievement of annual objectives<br><br>• *Payout level* based on ROTCE<br><br>• Subject to reduction for:<br><br>  › Total Shareholder Return<br><br>  › Net Operating Loss (NOL)[1] |

| | | | |
|---|---|---|---|
| | | • Dividends are accumulated and paid at vesting | Subject to ███ |
| **RSRs** | | • Promotes retention and alignment with shareholders with three year ratable vesting | • *Grant value* based on achievement of annual objectives |
| | | • *Grant value* based on achievement of annual objectives (same objectives as annual cash bonus) | • *Payout level* fixed with ultimate value tied to stock price |
| | | • Subject to robust holding requirements (updated in 2020) while an Operating Committee member until one year after retirement² | • ███ |
| | | • Dividends are accumulated and paid at vesting | |

**Our executive compensation program reinforces effective risk management through risk-balancing features that discourage and mitigate excessive risk-taking; *See 5. Risk Management and Accountability***

231.    The Proxy included the following discussion and chart detailing the conditions under which the Board/HRC will pursue clawback and/or forfeiture of the different elements of executive compensation:[117]

## Clawback and Forfeiture Policy

To further strengthen the Company's risk and control practices, we undertook a holistic review of our clawback policies and forfeiture provisions during 2020. As part of this review, we engaged an external compensation consultant to complete a market review of peer practices and obtained feedback from key internal stakeholders. ***This resulted in the HRC implementing a new, holistic Clawback and Forfeiture Policy (Policy)*** to replace two separate recoupment and clawback policies and performance-based vesting provisions maintained within award agreements. The new Policy is applicable for compensation awarded on or after January 1, 2021. ***By expanding the population of employees and types of incentive compensation awards subject to the Policy, as well as clawback triggers, the new Policy strengthens the HRC's and Board's ability to forfeit and recover compensation*** (as appropriate). The Policy is designed to discourage employees (including our named executives) from taking unnecessary or inappropriate risks that would adversely impact our Company or harm our customers. ***The new Policy provides the HRC and the Board with important tools they need to hold employees accountable***. A summary of the compensation-related actions the Company can take under the Policy is set forth below.

---

[117] *Id*. at p. 87.

| Trigger | Description | Compensation Impacted | Clawback | Forfeit |
|---|---|---|---|---|
| Financial Restatement / Inaccurate Performance Metrics | • Amount of the award was based upon the achievement of certain financial results that were subsequently reduced due to a financial restatement (public restatement) | Equity/Cash | ✓ | ✓ |
| | • Amount of the award was based upon one or more materially inaccurate performance metrics | Equity/Cash | ✓ | ✓ |
| Misconduct | • Employee engages in misconduct or commits an error that causes material financial or reputational harm | Equity/Cash | ✓ | ✓ |
| | • Any conduct that constitutes Cause | Equity | | ✓ |
| Risk Management Failure | • Failure through willful misconduct/gross negligence to identify, escalate, monitor, or manage, risks | Equity | ✓ | ✓ |
| Resolution of Outstanding Regulatory Matters *(Performance Shares granted in 2019 and later)* | • Failure of the employee to achieve progress on resolving outstanding consent orders and/or other regulatory matters | Equity | | ✓ |

Clawback applies to the most recent incentive compensation that has been vested and/or paid, so long as such payment(s) have taken place within five years from when the Committee approves a clawback.

232.    As the discussion and chart above demonstrate, the vastly enhanced and broad Clawback Policy that Wells Fargo adopted and implemented, effective January 1, 2021, applies to a very wide range of employee misconduct, not just a financial restatement.  Misconduct that will result in clawback/forfeiture includes "any conduct that causes harm," including but not limited to reputational harm to Wells Fargo, the "failure through willful misconduct/gross negligence to identify, escalate, monitor, or manage risks," and failure of an employee "to achieve progress on resolving outstanding consent orders and/or other regulatory matters."

233.    The Proxy also disclosed that the Human Resources Committee Board members are responsible for making Clawback decisions.  Their role in doing so was again touted in the Proxy as a major part of what supposedly had caused Wells Fargo to remediate its dismal risk management and internal controls that previously existed and which had allowed the "fake account" scandal to occur.  The 2021 Proxy stated: "The HRC has made significant changes to our executive compensation program over the last

few years to . . . discourage imprudent risk-taking and hold individuals accountable, as appropriate."[118]

234.    The Board and HRC represented to stockholders in the Proxy that "The new Policy provides the HRC and the Board with important tools they need to hold employees accountable."

235.    Therefore, as members of the HRC, Directors Black, Hewett, Morris, and Sargent had decision-making authority and responsibility with respect to the Company's executive Clawback Policy.  That policy, as demonstrated above, allows Wells Fargo to clawback the executive compensation of all senior executives and members of its Operating Committee for includes "any conduct that causes harm."  The Clawback Policy is strictly NOT LIMITED to instances of financial misconduct relating to an accounting restatement, as many corporations' clawback policies are.

236.    Wells Fargo's Clawback Policy thus specifically and expressly applies to the severe financial and reputational damage to Wells Fargo, failures of risk management, and false statements and/or SEC filings issued and/or approved by the Individual Defendants related to the Company's DEI initiatives and Diverse Slate Program, as detailed *supra*.  As a result, the Board as a whole, as well as Directors Black, Hewett, Morris, and Sargent (as members of the HRC) were required to perform an investigation of whether the compensation of the Company's senior executives and Operating Committee members should be clawed back/forfeited.

237.    The HRC board minutes and packages produced by Wells Fargo in response to Plaintiff's stockholder inspection demand, however, reveal that ███████████ ████████████████████████████████████████████████████████████████, ████████████████████████████████.  As a result, the Board as a whole and Directors Black, Hewett, Morris, and Sargent abdicated their duties as members of the HRC and acted in bad faith.

---

[118] *Id.* at 68.

**M.    Defendant Santos, Who Was in Charge of the Diverse Slate Program, Engaged in Insider Selling Shortly Before the Truth Was Announced**

238.    On May 3, 2022, shortly before the truth about the fake interviews began to be disclosed, Defendant Santos sold 22,700 shares of his Wells Fargo stock while in possession of material non-public information for proceeds of approximately $1,008,788.

239.    The insider selling by Santos was highly unusual in timing and amount. First, Santos did not sell his stock pursuant to a Rule 10b5-1 plan. Second, Santos sold a highly unusual amount of his Wells Fargo stock – 51.4% of all his stock. After his sale, Santos only retained 21,478 shares. Third, the timing of the sale – coming just two weeks before the New York Times published its first explosive story which began to expose the truth about the fake account scandal based on reports from Wells Fargo employees – constitutes strong indicia of scienter. Third, Santos had not engaged in any major sales of his Wells Fargo stock in the two years prior to his May 3, 2022 sale.

## IX.    DAMAGES TO WELLS FARGO

240.    Wells Fargo has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

241.    As a direct and proximate result of the Individual Defendants' misconduct, Wells Fargo has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

    a.    At least $7.148 billion in damages from repurchasing its stock at inflated prices;

    b.    $1 billion to resolve securities fraud claims arising from false statements about the pace of Wells Fargo's remediation efforts. *In re Wells Fargo & Company Sec. Litig.*, No. 1:20-cv- 04494-GHW-SN (S.D.N.Y.) ("Securities Action").

c.  legal fees and fines associated with the lawsuits filed against the Company by regulators and shareholders for violations of multiple federal and state laws;

d.  legal fees and severe reputational damage related to the fake interview scandal;

e.  loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Individual Defendants' false statements and lack of candor to the marketplace;

f.  amounts paid to outside lawyers, accountants, and investigators in connection with Wells Fargo's internal investigation;

g.  legal fees and penalties related to the criminal probe being conducted by the U.S. Attorneys' Office;

h.  legal fees and fines related to the SEC investigation;

## X.     DERIVATIVE ALLEGATIONS

242.     Plaintiff brings this action for the benefit of Wells Fargo to redress injuries suffered as a result of the Individual Defendants' breaches of fiduciary duties and violations of law, as well as the aiding and abetting thereof.

243.     Wells Fargo is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

244.     Plaintiff is and has been a Wells Fargo shareholder during the entire Relevant Period because she has continuously owned Wells Fargo common stock since at least 2011.  Plaintiff therefore will adequately and fairly represent the interests of Wells Fargo in enforcing and prosecuting its rights.

245.     Wells Fargo's Board at the time this action was initiated consisted of the following directors:  Black; Chancy; Clark; Craver, Jr., Davis; Hewett; Morken; Morris; Norwood; Payne, Jr.; Pujadas; Sargent; Scharf; and Vautrinot.  Plaintiff has not made

1    any demand on the Board to institute this action against the Individual Defendants

2    because, for the reasons set forth below, such demand would be a futile and useless act.

3         246.    When a board of directors is comprised of an even number of directors, a

4    stockholder need only demonstrate demand futility as to half the board members.  Thus,

5    here, since Wells Fargo's board is comprised of 14 members, Plaintiff need only

6    demonstrate demand futility as to seven of the fourteen members.

7         **A.    Demand Is Futile as to Scharf**

8         247.    According to the Company's Proxy statement, Defendant Scharff is not an

9    independent director under NYSE listing standards.  This decision as to Scharf's lack of

10   independence was made by the Board itself.

11        248.    Moreover, Scharff is interested in this litigation for purposes of demand

12   futility because he faces a substantial likelihood of liability for his individual

13   misconduct.  Scharf is a named defendant in the federal class action pending in the N.D.

14   Cal., SEB INVESTMENT MANAGEMENT AB, and WEST PALM BEACH

15   FIREFIGHTERS' PENSION FUND v. Wells Fargo & Co. et al, No. 3:22-cv-03811 (N.D.

16   Cal.), alleging that he violated § 10(b) of the Exchange Act and Rule 10b-5 when he

17   disseminated or approved the false and misleading statements set forth above.

18        249.    If Scharf pursued these derivative claims, then that would expose his own

19   misconduct in the class action for violations of the federal securities laws.  As such,

20   Scharf is fatally conflicted, and therefore, unable to render a disinterested decision as to

21   whether the Company should pursue these derivative claims.  Thus, demand is futile.

22        250.    Scharf cannot render an independent decision because he is a high-

23   ranking officer of Wells Fargo.  As his principal professional occupation, Scharf has been

24   the CEO and President of the Company since 2019.  As alleged herein, as a result of his

25   supposed extraordinary success in leading DEI initiatives, including the Diverse Search

26   Requirement program, Scharf was awarded $5,365,854 in incentive-based

27

28

compensation for 2021, and total compensation of $21,350,906.  From 2019 to 2021, Scharf was awarded total compensation by Wells Fargo of $76,029,526.

251.    Demand is futile as to Scharf because instituting any action would jeopardize the lavish compensation Scharf is expected to receive in future years from Wells Fargo, and could jeopardize his right to the bonus and incentive compensation Scharf received during the time of the fake interview scandal since Wells Fargo has an extremely broad executive compensation clawback policy since 2021, pursuant to which compensation can be recouped due merely to reputational damage to the Company and/or failures of risk management, as detailed *supra*.  The clawback policy applies to all senior executives and members of the Company's Operating Committee, and thus applies to at least Defendants Scharf, Powell, Santomassimo, and Weiss.

252.    Additionally, Scharf is interested because he issued many of the false and misleading statements and was in direct charge of the DEI programs that are at issue in this case.  Scharf therefore faces a substantial likelihood of liability for breaching his fiduciary duties.  Consequently, Stumpf cannot disinterestedly consider a demand.

**B.    Demand Is Futile as to Defendants Black, Hewett, Morris, and Sargent Who, as Members of the HRC, Had Direct Responsibility for Oversight of the Diverse Slate Program and the Executive Clawback Policy and Acted in Bad Faith**

253.    Demand is futile as to Directors Black, Hewett, Morris, and Sargent because they are members of the Human Resources Committee ("HRC") and were members of such committee during the Relevant Period.

254.    As alleged in more detail *supra*, the HRC Committee was directly responsible for the Diverse Search Requirement Program and received regular updates and detailed information about such program.

255.    Directors Black, Hewett, Morris, and Sargent knew or recklessly disregarded the fact that fake interviews were being conducted of minority job applicants and failed to take action to stop this abusive practice.  Directors Black,

1    Hewett, Morris, and Sargent also approved false SEC filings which made

2    misrepresentations about the Diverse Search Requirement program and failed to

3    disclose material information necessary to correct the false statements and/or prevent

4    such statements from being misleading.  As a result, Directors Black, Hewett, Morris,

5    and Sargent breached their fiduciary duties of candor, good faith, and loyalty.  Such

6    conduct cannot be indemnified by Wells Fargo, and thus Defendants Directors Black,

7    Hewett, Morris, and Sargent face a substantial likelihood of liability in this action,

8    precluding them from being independent with respect to a decision as to whether to

9    cause the Company to bring the claims asserted herein.  Demand is therefore futile as to

10    Directors Black, Hewett, Morris, and Sargent.

11          256.    In addition, as members of the HRC, Directors Black, Hewett, Morris, and

12    Sargent had decision-making authority and responsibility with respect to the Company's

13    executive Clawback Policy.  That policy allows Wells Fargo to clawback the executive

14    compensation of all senior executives and members of its Operating Committee for any

15    serious misconduct.  The Clawback Policy is strictly NOT LIMITED to instances of

16    financial misconduct relating to an accounting restatement, as many corporations'

17    clawback policies are, *and instead specifically and expressly applies to any*

18    *serious misconduct, including but not limited to reputational damage to*

19    *Wells Fargo and failures or risk management*, as detailed supra.  As a result,

20    given the major, substantial, and highly material reputational damage to Wells Fargo

21    and the material failures of risk management at the Company which were caused by the

22    Individual Defendants' wrongdoing related to the relevant DEI initiatives, Diverse

23    Search Requirement, and false statements and/or SEC filings issued and/or approved

24    by the Individual Defendants, Directors Black, Hewett, Morris, and Sargent were

25    required to perform an investigation of whether the compensation of the Company's

26    senior executives and Operating Committee members should be clawed back by Wells

27    Fargo.

28

257. ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████ by Defendants Directors Black, Hewett, Morris,

and Sargent. As a result, Directors Black, Hewett, Morris, and Sargent abdicated their

duties as members of the HRC and acted in bad faith, since they had actual knowledge

of the severe reputational harm and failures or risk management caused by the

Defendants' wrongdoing. As a result, Directors Black, Hewett, Morris, and Sargent are

personally interested in the claims asserted herein. Because this action seeks recovery

of the amount of executive compensation unjustly received/retained by Defendants

Scharf, Powell, Santomassimo, and Weiss, and because the HRC members have failed to

fulfill their fiduciary duties to investigate whether such amounts are subject to clawback

under the Company's Clawback Policy, Directors Black, Hewett, Morris, and Sargent

would be implicating their own liability by voting to pursue the claims asserted herein.

As a result, Directors Black, Hewett, Morris, and Sargent face a substantial likelihood of

liability in this action, precluding them from being independent with respect to a

decision as to whether to cause the Company to bring the claims asserted herein.

Demand is therefore futile as to Directors Black, Hewett, Morris, and Sargent.

**C.    Demand is Futile as to All Directors Because They Approved the Issuance of the False and Misleading Statements**

258. Demand is futile as to all the Director Defendants because each Director

Defendant approved one or more of the false and misleading statements alleged herein

at a time when such Director knew or recklessly disregarded the falsity of the

statements. As a result, all Director Defendants face a substantial likelihood of liability

for breaching their fiduciary duties and violating the federal proxy laws. All such

directors are therefore interested in a demand and thus any demand as to the Board

would be a futile and useless act.

259.    All Director Defendants had actual knowledge of the undisclosed material facts alleged herein and knowingly or consciously disregarded them and acted in bad faith by taking action inimical to the best interests of Wells Fargo.

260.    The knowledge or reckless disregard of all Board members regarding the true facts concerning the Company's Diverse Search Requirement program is demonstrated in great detail *supra*.

261.    Moreover, a reasonable inference of the Director Defendants' actual knowledge can be drawn based on the Company's own admission that the Director Defendants were provided with detailed and frequent updates regarding the Company's Diverse Search Requirement program and DEI operations.  The Company's Corporate Governance Guidelines state:

> "***Board members have complete access to the Company's management. In addition, the Company's management is expected to update the Board on any significant Company or competitive developments or matters between Board meetings***. Non-Board members who are members of the Company's Operating Committee regularly attend Board and most committee meetings."[119]

262.    In addition, in its March 2020 Proxy, March 2021 Proxy, and March 2022 Proxy, Wells Fargo admitted that it monitored its progress on enhancing diversity at all levels of the Company using numerous internal and external metrics.  DE&I metrics and activities were also included in all regular business reviews to gauge whether the Company was meeting its DE&I goals.  Moreover, Wells Fargo's Board and its Human Resources Committee received regular reporting on the Company's DE&I initiatives, including updates on the Company's progress and accomplishments across its DE&I commitments and information related to talent acquisition and development and diversity reporting.  And beginning in the fall of 2020, the full Board received DE&I updates at each regularly scheduled Board meeting, including regarding the Company's

---

[119] *See* Wells Fargo Corporate Governance Guidelines, available at https://wwww08.wellsfargomedia.com/assets/pdf/about/corporate/governance-guidelines.pdf

1    progress on its DE&I commitments.  Indeed, Wells Fargo's then-Chairman of the Board,

2    Charles H. Noski, stated in a signed letter at the front of Wells Fargo's March 2021

3    Proxy that "[t]he Board and its Human Resources Committee are fully engaged in

4    overseeing Wells Fargo's diversity, equity, and inclusion initiatives and human capital

5    management to support management in its efforts to drive meaningful change."

6        263.    As demonstrated by the detailed allegations from Wells Fargo's Board and

7    Board committee minutes alleged supra, all the Director Defendants knew or recklessly

8    disregarded the true, undisclosed facts, all of which posed a material risk to the

9    Company if left unremedied.  Fraud is always material to a Company's operations and

10    the risks faced by a company. In conscious disregard of their fiduciary duties, the

11    Director Defendants failed to take necessary action, ***thus abdicating their***

12    ***fiduciary duties and acting in a disloyal, bad faith manner***.

13        264.    Conscious or reckless disregard of known risks by board members

14    constitutes bad faith, disloyal conduct.  Such conduct cannot be indemnified by Wells

15    Fargo under Delaware law and thus creates a substantial risk of personal liability for all

16    current Board members.  Demand is thus futile as to all directors.

17        265.    If Wells Fargo's officers and directors are protected against personal

18    liability for their breaches of fiduciary duties alleged in this complaint by D&O

19    insurance, they caused the Company to purchase that insurance for their protection with

20    corporate funds, i.e., monies belonging to the shareholders.  Upon information and

21    belief, the D&O insurance policies covering the Individual Defendants in this case

22    contain provisions that eliminate coverage for any action brought directly by Wells

23    Fargo against the Individual Defendants, known as the "insured versus insured

24    exclusion."  As a result, if the Director Defendants were to sue themselves or certain of

25    the officers of Wells Fargo, there would be no D&O insurance protection.  On the other

26    hand, if the suit is brought derivatively, as this action is brought, such insurance

27    coverage exists and will provide a basis for the Company to effectuate recovery.

28

Therefore, the Board cannot be expected to file the claims asserted in this derivative lawsuit because such claims would not be covered under Wells Fargo's D&O insurance policy.

266.    Although Wells Fargo has been and will continue to be exposed to significant losses due to the Individual Defendants' wrongdoing, the Board has not filed any lawsuits against any directors or officers who were responsible for the losses, and has not even taken any action to investigate whether executive compensation should be recouped or forfeited under the Company's Clawback Policy.  Thus, the Director Defendants are breaching their fiduciary duties to the Company and face a substantial likelihood of liability for their breaches.  Indeed, the Director Defendants are more interested in protecting themselves than they are in protecting Wells Fargo by bringing this action.  Thus, demand on the Board is futile.

## XI.    CAUSES OF ACTION

### COUNT I

### Breaches of Fiduciary Duties Against All Individual Defendants

267.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

268.    Each of the Individual Defendants owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Wells Fargo's business and affairs, particularly with respect to issues regarding the Company's financial reporting and internal controls.

269.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, and reasonable inquiry.

270.    The Individual Defendants' misconduct set forth herein was characterized by their intentional, reckless, or negligent breaches of the fiduciary duties they owed to Wells Fargo to protect its rights and interests.

271.    In breach of their fiduciary duties owed to Wells Fargo, the Individual Defendants willfully participated in misrepresentation of the Company's financial condition, failed to correct the Company's public statements, and failed to fully inform themselves prior to making decisions as directors and officers, rendering them personally liable to the Company for breaching their fiduciary duties.

272.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent its financial condition and they failed to correct the Company's public statements.  Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Wells Fargo's securities.

273.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

274.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Wells Fargo has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, Defendants are liable to the Company.

## COUNT II

**Unjust Enrichment Against Defendants Scharf, Powell, Santomassimo, and Weiss**

275.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

276.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Wells Fargo.

277.    During the Relevant Period, the Individual Defendants either received bonuses, stock options, stock, and/or incentive compensation from Wells Fargo that was tied to the financial performance of Wells Fargo or received compensation that was unjust in light of the Individual Defendants' bad faith conduct and self-dealing.

278.    While all the details of the Defendants' unjust enrichment is unknown because it is within Defendants' exclusive possession and control, some of the unjust payments have been disclosed in part.  For example, as alleged herein, as a result of his supposed extraordinary success in leading DEI initiatives, including the Diverse Search Requirement program, Scharf was awarded $5,365,854 in incentive-based compensation for 2021, and total compensation of $21,350,906.  From 2019 to 2021, Scharf was awarded total compensation by Wells Fargo of $76,029,526.

279.    Defendants Powell, Santomassimo, and Weiss were awarded at least the following compensation during the Relevant Time Period:

The following table sets forth information about compensation paid, accrued, or awarded to the Company's named executives for the years indicated.

| Name and Principal Position (a) | Year (b) | Salary ($) (c) | Bonus ($)[1] (d) | Stock Awards ($)[2][3] (e) | Non-Equity Incentive Plan Compensation ($)[4] (f) | All Other Compensation ($)[7] (h) | Total ($) (i) |
|---|---|---|---|---|---|---|---|
| Charles W. Scharf | 2021 | 2,500,000 | — | 13,485,052 | 5,365,854 | — | 21,350,906 |
| CEO and President | 2020 | 2,500,000 | — | 13,542,046 | 4,350,000 | — | 20,392,046 |
| | 2019 | 498,084 | 5,000,000 | 28,788,490 | — | — | 34,286,574 |
| Michael P. Santomassimo | 2021 | 1,750,000 | 900,000 | 7,500,008 | 1,837,500 | — | 11,987,508 |
| Senior EVP, Chief Financial Officer | 2020 | 367,366 | 1,750,000 | 5,990,344 | — | — | 8,107,710 |
| Scott E. Powell | 2021 | 1,750,000 | — | 5,568,758 | 1,968,750 | 17,400 | 9,304,908 |
| Senior EVP, Chief Operating Officer | 2020 | 1,750,000 | 3,200,000 | 7,900,563 | 1,771,925 | — | 14,622,488 |
| Jonathan G. Weiss | 2021 | 1,750,000 | — | 5,323,428 | 1,925,000 | 17,400 | 9,015,828 |
| Senior EVP, CEO of Corporate and Investment Banking | | | | | | | |

280.    Plaintiff, as a shareholder and representative of Wells Fargo, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including any salary, options, performance-based compensation and stock, obtained by the Individual Defendants due to their wrongful conduct and breaches of their fiduciary duties.

**COUNT III**

**Claim for Contribution and Indemnification Against Individual Defendants Scharf and Santos**

281.    Plaintiffs incorporate by reference and reallege each and every allegation contained above as though fully set forth herein.

282.    This Claim is brought derivatively by plaintiff on behalf of the Company against Individual Defendants Scharf and Santos for contribution and indemnification.

283.    Wells Fargo is alleged to be liable to the putative class in the related Securities Fraud Class Action for misleading the public about the Company's operations and results.  In the event the Company is found liable to those plaintiffs for violating the federal securities laws, the Company's liability will arise, in whole or in part, from the intentional, knowing, or reckless acts or omissions of some or all of the Individual Defendants as alleged herein, and the Company will be entitled to receive contribution from those Individual Defendants in connection with the securities fraud actions against the Company currently pending in this District.  In the event the Company is found liable to those persons, the Company's liability will result in whole or in part from the intentional, knowing, reckless, or grossly negligent acts or omissions of those Individual Defendants as alleged herein.

284.    Plaintiff demands that the Defendants Scharf and Santos provide the Company with all appropriate contribution or indemnification.

**COUNT IV**

**Declaratory Relief Against All Individual Defendants**

285.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

286.    As alleged herein, the Individual Defendants engaged in willful breaches of fiduciary duties owed to Wells Fargo in bad faith.  In connection with this and other lawsuits, Wells Fargo has advanced or will advance millions of dollars in legal fees and expenses to such defendants based upon the Company's obligations pursuant to, inter alia, its certificate of incorporation, bylaws, indemnification agreements and California Labor Code §2802.

287.    The Individual Defendants must return all monies advanced to them by Wells Fargo because under applicable law the Company may not indemnify these defendants for acts that: (i) were not in good faith; (ii) were not in the best interests of the Company; and (iii) were unlawful.  As alleged herein, actions taken by these defendants were in bad faith; not in Wells Fargo's best interest; and were unlawful.

288.    Accordingly, plaintiffs seek a declaration that the Individual Defendants are not entitled to indemnification from Wells Fargo and must therefore return all advanced legal fees, expenses and other monies to the Company.

289.    Plaintiffs do not concede the validity of any indemnification agreements entered into between Wells Fargo and the Individual Defendants.

**COUNT V**

**Aiding and Abetting Breaches of Fiduciary Duties Against the Individual Defendants**

290.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

291.    The Individual Defendants all aided and abetted each other in breaching their fiduciary obligations owed to Wells Fargo resulting in the wrongdoing and

1   damages to the Company.  The Individual Defendants knew or should have known that

2   Wells Fargo was engaging in unlawful conduct with respect to the Diverse Search

3   Requirement program, that Wells Fargo was intentionally overriding its internal

4   controls, that Wells Fargo lacked other essential internal controls over its operations,

5   that Wells Fargo was unlawfully engaging in fake interviews of potential employees to

6   attempt to manufacture a fake appearance of progress on diversity, that the Company's

7   officers and directors, including the Individual Defendants, were earning unlawful and

8   unmerited compensation tied to the unlawful conduct, that the Individual Defendants

9   were making or causing the Company to make false statements in the Company's SEC

10  filings, press releases, and comments to analysts and the financial markets, that the

11  Individual Defendants were causing the Company to repurchase hundreds of millions of

12  shares of its stock at inflated prices, and that the Company was engaging in other

13  unlawful and unethical conduct  Nevertheless, the Individual Defendants actively

14  prepared and/or approved the false and misleading information, engaged in the conduct

15  described herein, and thereby aided and abetted each others' breaches of fiduciary

16  duties and their abuse of control, gross mismanagement and violation of their duty of

17  candor, loyalty, and good faith to Wells Fargo complained of herein.

18       292.    As a direct, foreseeable, and proximate result of the Individual Defendants'

19  aiding and abetting each others' breaches of fiduciary duties, Wells Fargo has been

20  damaged.

21                              **COUNT VI**

22              **Accounting Against All Individual Defendants**

23       293.    Plaintiff incorporates by reference and realleges each and every allegation

24  set forth above, as though fully set forth herein.

25       294.    At all relevant times, the defendants, as directors and/or officers of Wells

26  Fargo, owed the Company and its shareholders fiduciary duties of good faith, care,

27  candor and loyalty.

28

295.    In breach of their fiduciary duties owed to Wells Fargo and its shareholders, the defendants caused Wells Fargo, among other things, to grant options, restricted stock units,  and other incentive compensation to themselves and/or certain other officers and directors of Wells Fargo which was unwarranted due to the unlawful conduct alleged herein, and/or allowed certain of the defendants to sell stock while in the possession of material, non-public information. By this wrongdoing, the defendants breached their fiduciary duties owed to Wells Fargo and its shareholders.

296.    The Defendants also caused Wells Fargo to incur over $1.69 billion in damages by repurchasing its own stock at inflated prices.  Much of the particulars of the stock repurchases is non-public information that can only be ascertained through discovery.

297.    The defendants possess complete and unfettered control over their stock option grants, compensation, stock sales, and the books and records of the Company concerning the details of such improper benefits to the defendants and damages to the Company from the stock repurchases.

298.    As a result of defendants' misconduct, Wells Fargo has been substantially injured and damaged financially and is entitled to a recovery as a result thereof.

299.    Plaintiff demands an accounting be made of all compensation and benefits realized by the Individual Defendants during the Relevant Period and all details regarding the Company's stock repurchases.

300.    Since the use of the Company's proprietary information for their own gain constitutes a breach of the defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits they obtained thereby.

1

2

3

**COUNT VII**

**Against the Insider Selling Defendant (Kleber Santos) for Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information**

4

5

301.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

6

7

302.    This cause of action is brought under Delaware law, the state of Wells Fargo's incorporation.

8

9

10

303.    At the time of the stock sales set forth herein, the Insider Selling Defendant (Santos) knew the information described above, and sold Wells Fargo common stock on the basis of such information.

11

12

13

14

15

304.    The information described above was proprietary non-public information concerning the Company's unlawful conduct associated with the Diverse Search Requirement program.  It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold Wells Fargo common stock.

16

17

18

305.    The Insider Selling Defendant's sales of Wells Fargo common stock while in possession and control of this material adverse, non-public information was a breach of his fiduciary duties of loyalty and good faith.

19

20

21

22

306.    Since the use of the Company's proprietary information for his own gain constitutes a breach of the Insider Selling Defendant's fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendant obtained thereby.

23

**COUNT VIII**

24

25

**Violation of Section 14(a) of the Exchange Act Against the Director Defendants**

26

27

307.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

28

308. The Director Defendants issued, caused to be issued, and participated in the issuance of materially false and misleading written statements and material omissions to shareholders that were contained in the Company's Proxy Statements, as alleged *supra*. The Proxy Statements misrepresented material facts and failed to disclose to the Company's shareholders the information alleged herein. By reason of the conduct alleged herein, the Director Defendants, who caused the issuance of Proxy Statements, violated Section 14(a) of the Exchange Act. As a direct and proximate result of these Defendants' wrongful conduct, the Company misled and/or deceived its shareholders by falsely portraying the information about the Company, its DEI initiatives and the Company's officers and directors. The false and misleading information in the Proxy Statements was an essential link and proximately caused damage to the Company and its stockholders.

309. Plaintiff, on behalf of the Company, thereby seeks all appropriate damages and declaratory and injunctive relief in connection with the misleading and incomplete Proxy Statements.

310. This action was timely commenced within five years of the date of the 2015 Proxy Statement and within two years from the time that plaintiffs discovered or reasonably could have discovered the facts upon which this Complaint is based.

## COUNT IX

**Violation of Section 29(b) of the Securities Exchange Act of 1934 Against All Individual Defendants**

311. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

312. As a result of their conduct, as alleged herein, the Individual Defendants violated Section 14(a) of the Securities Exchange Act during the time that they entered into contracts with Wells Fargo regarding their compensation.

313.     As opposed to many companies which limit clawback compensation to situations where a company restates its financial results, Wells Fargo has a very extensive Compensation Clawback policy, pursuant to which compensation can be clawed back based on reputational harm to the Company, a failure to supervise, violation of the Company's Code of Ethics, and other circumstances.

314.     If Wells Fargo attempts to clawback compensation to the Individual Defendants, such defendants may assert a breach of contract claim.

315.     Section 29(b) of the Exchange Act provides equitable remedies which include, among other things, provisions allowing for the voiding of contracts where the performance of the contract involved violation of any provision of the Exchange Act.

316.     Here, the Individual Defendants violated provisions of the Exchange Act while performing their duties arising under various employment and other contracts they entered into with Wells Fargo.

317.     Wells Fargo was and is an innocent party with respect to Defendants' Exchange Act violations.

318.     Plaintiff, on behalf of Wells Fargo, seeks rescission of the contracts between the Individual Defendants and Wells Fargo due to Defendants' violations of the Exchange while performing their job duties.

319.     Even if the contracts are not rescinded by the Court as a result of Defendants' '34 Act violations, the Court can and should award equitable remedies in the form of injunctive relief barring the Individual Defendants from asserting breach of contract by Wells Fargo in any action by Plaintiff on behalf of Wells Fargo to claw back compensation from Defendants.

320.     Plaintiff seeks declaratory, injunctive, and equitable relief only in this claim.

## XII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment in favor of Plaintiff and Wells Fargo and against all Defendants as follows:

A.    Declaring that Plaintiff may maintain this action on behalf of Wells Fargo and that Plaintiff is an adequate representative of Wells Fargo;

B.    Declaring that the Individual Defendants have breached and/or aided and abetted the breaches of their fiduciary duties to Wells Fargo;

C.    Determining and awarding to Wells Fargo the damages sustained by it as a result of the violations set forth above from each Defendant, jointly and severally, together with pre-judgment and post-judgment interest thereon;

D.    Ordering an accounting of all compensation awarded to the Individual Defendants during the Relevant Period;

E.    Issuing a declaration regarding the Individual Defendants' obligation to have certain compensation clawed back by Wells Fargo pursuant to the Company's compensation Clawback Policy;

F.    Ordering rescission of the Individual Defendants' employment contracts with Wells Fargo or, alternatively, declaring that the Individual Defendants may not assert a breach of contract defense against Wells Fargo in any action by Plaintiff on behalf of Wells Fargo to clawback compensation received by the Individual Defendants;

G.    Directing Wells Fargo and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Wells Fargo and its shareholders from a repeat of the damaging events described herein.

H.    Awarding Wells Fargo restitution from the Individual Defendants and each of them, and ordering them to disgorge all inequitable profits, benefits, and other compensation;

I.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

1     J.     Granting such other and further relief as the Court deems just and proper.

2  **XIII.  DEMAND FOR JURY TRIAL**

3     Plaintiff demands a trial by jury on all issues so triable.

4

5  Dated: September 26, 2023                    Respectfully submitted,

6

7                                              COTCHETT, PITRE & MCCARTHY LLP
                                               Frank M. Pitre (SBN 100077)
                                               Mark C. Molumphy (SBN 168009)
8                                              Tyson Redenbarger (SBN 294424)
                                               Gia Jung (SBN 340160)

9                                               _/s/ Tyson C. Redenbarger_
10                                               Tyson C. Redenbarger

11                                             San Francisco Airport Office Center
                                               840 Malcolm Road Burlingame, CA 94010
12                                             Telephone: (650) 697-6000
                                               Fax: (650) 697-0577
13                                             E-mail:
                                                        fpitre@cpmlegal.com
14                                                      mmolumphy@cpmlegal.com
                                                        tredenbarger@cpmlegal.com
15                                                      gjung@cpmlegal.com

16                                             BOTTINI & BOTTINI, INC.
17                                             Francis A. Bottini, Jr. (SBN 175783)
                                               Albert Y. Chang (SBN 296065)
18                                             Anne B. Beste (SBN 326881)

19

20                                              _/s/ Francis A. Bottini, Jr._
21                                               Francis A. Bottini, Jr.

22                                             7817 Ivanhoe Avenue, Suite 102
                                               La Jolla, California 92037
23                                             Telephone:    (858) 914-2001
                                               Facsimile:    (858) 914-2002
24                                             E-mail:       fbottini@bottinilaw.com
                                                             achang@bottinilaw.com
25                                                           abeste@bottinilaw.com

26                                             _Attorneys for Plaintiff Amy Cook_

27

28

**Verified Shareholder Derivative Complaint**                    - 100 -

1

**ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(i)(3)**

2

I, Tyson C. Redenbarger, attest that concurrence in the filing of this document has

3

been obtained from the other signatory.  I declare under penalty of perjury under the

4

laws of the United States of America that the foregoing is true and correct.

5

Executed this 26th day of September 2023, at Burlingame, California.

6

7

/s/ Tyson C. Redenbarger

Tyson C. Redenbarger

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# VERIFICATION

I, Amy J. Cook, verify that I am a shareholder of record of nominal defendant Wells Fargo & Company ("Wells Fargo"), and that I have continuously owned Wells Fargo stock since June 17, 2008. I have reviewed the allegations in this Shareholder Derivative Complaint (the "Complaint"). As to those allegations of which I have personal knowledge, I believe them to be true; as to those allegations of which I lack personal knowledge, I rely upon my counsel and counsel's investigation, and believe them to be true. Having received a copy of the Complaint and reviewed it with counsel, I authorize its filing.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: _9/22/2023 | 10:06 AM PDT_
_____

_____
_Ms. Amy J. Cook_
Amy J. Cook